OPINION
{¶ 1} C. Jeffrey Mahan started C.J. Mahan Construction Company ("company") in 1973 and incorporated in 1977. His best friend, Michael Wells, also worked for the company and was a shareholder. The company began as a surveying company and evolved into a construction company. In 1981, the company had approximately one to two million dollars in annual sales. (Tr. at 1470-1471.) In March 1981, Thomas Eugene Horne joined the company and by 1994 the company had over 200 employees and $20-30 million in annual sales. (Tr. at 1467-1471.) Horne became a shareholder and owned 720 shares, which was approximately 20 percent of the shares. (Jt. Ex. 1, at J001-011; Tr. at 316.)
 {¶ 2} In December 1998, the company purchased Horne's shares because Horne was retiring. Horne was paid an initial payment of ten percent in September 1998, 22 and 1/2 percent over four years and a ten percent final payment for a total of $1,543,886.25 plus interest. (Tr. at 319-322.) He was paid $2,144.29 per share. (Tr. at 323.) After Horne retired, Michael Wells owned approximately one-third interest in the company.
 {¶ 3} In late 1997, Michael Wells discussed with Mahan his unhappiness over his compensation in relation to Horne and Mahan. Michael Wells then received a $60,000 distribution and a $1,000,000 distribution was to be paid pro rata to the shareholders in the spring of 1998, and Wells did receive $264,000. On August 7, 1999, Michael Wells died unexpectedly. The company had a life insurance policy on his life for $1.5 million.
 {¶ 4} Michael Wells' shares were subject to a redemption provision in the Shareholder Agreement, which provides, as follows:
Death of a Shareholder
3.3.1. If the Corporation is the beneficiary of a policy of insurance on the life of a Shareholder and if the Corporation receives notice of the death of such Shareholder (such deceased Shareholder is hereinafter referred to as "Decedent"), then within 30 days of the date the Corporation receives such notice, the Board shall determine the Board-Determined Value Per Share, as of the date of Decedent's death, of the Shares held by Decedent. Within 15 days after such determination is made, the Corporation shall notify the Decedent's legal representative ("Representative") of the amount so determined.
3.3.2. In the event the Representative wishes to dispute the Board-Determined Value Per Share, the Representative shall, (a) within 15 days after being notified of the Board-Determined Value Per Share, deliver to the Corporation a notice (a "Representative Objection") that the Representative disputes the Board-Determined Value Per Share, and (b) within 45 days after being notified of the Board-Determined Value Per Share, deliver to the Corporation an appraisal (the "Representative Appraisal") of the fair market value per share, as of the date of Decedent's death, of the Shares held by Decedent (the "Representative Appraised Value Per Share") prepared by a competent and qualified appraiser of closely-held corporations. The Representative Appraisal shall be done at the Representative's own cost and expense. Life insurance proceeds payable to the Corporation as a result of Decedent's death shall not be taken into account by the appraiser in the Representative Appraisal.
3.3.3. In the event the Corporation does not receive a Representative Objection within the time specified, or, if it receives a Representative Objection within the time specified but does not receive a Representative Appraisal within the time specified, the Board-Determined Value Per Share shall be deemed to be the "Redemption Price Per Share." In the event the Corporation receives a Representative Objection and a Representative Appraisal within the time specified, 75% of the Representative Appraised Value Per Share shall be deemed to be the Redemption Price Per Share times the number of Shares held by the Representative; provided, however, that of the proceeds of the insurance policy on Decedent's life is less then such amount, the Corporation shall redeem only that number of Shares which equals the amount of such insurance proceeds divided by the Redemption Price Per Share. Any remaining Shares held by the Representative shall be subject to the provisions of Section 3.2. If the amount of such insurance proceeds exceeds the Redemption Price Per Share times the number of shares held by the Representative, the Corporation shall retain such excess, free and clear of any claim by the Representative.
3.3.4. Decedent or his legal representative shall be deemed to have given notice (pursuant to Section 3.2.1) of his or her intent to sell any Shares not redeemed by the Corporation pursuant to Section 3.3.3 as of the date the Corporation receives notice of Decedent's death.
3.4. Transfer of Complete Interest. Any Shareholder who Transfers such Shareholder's complete interest in such Shareholder's Shares in compliance with the terms of this Section 3 shall no longer be deemed a Shareholder and shall have no further rights or liabilities hereunder.
(Joint Ex. 1.)
 {¶ 5} The Board determined value of $1.3 million was rejected by plaintiff-appellee, Marie Wells, Michael Wells' wife and the executor of his estate ("appellee"). Appellee had an appraisal of the fair market value per share completed, which was $2,900 per share or $1,837,773 total. (Joint Ex. 7.) Mahan, on behalf of the Board of Directors, rejected the Representative Appraisal because it contained a mathematical error and other inconsistencies. The mathematical error was corrected at the board meeting and reduced the fair market value per share to approximately $2,600 per share. (Plaintiff's Ex. 82.)
 {¶ 6} On February 26, 2001, appellee filed a complaint against Mahan and C.J. Mahan Construction Company alleging breach of contract when the company and Mahan refused to pay for the redemption of the shares, frustration of purpose and breach of fiduciary duty by Mahan for paying himself excessive and unreasonable compensation, causing the company to make a distribution in 1996 that was not pro rata and causing the company to make unauthorized loans in 1999 and 2000, which were unavailable to other shareholders. Appellee also alleged that these breaches of fiduciary duty were fraudulently concealed from her.
 {¶ 7} Appellee filed two amended complaints. In the second amended com-plaint, appellee contended that the provision in the Shareholder Agreement providing a 25 percent discount was designed as a dispute resolution provision to ensure finality and to avoid litigation. Thus, under a frustration of purpose theory, appellee sought to receive 100 percent of the fair market value of her valuation of the shares.
 {¶ 8} After a jury trial, the trial court found against the company and in favor of appellee on the breach of contract claim and awarded $1,661,506.85 ($1,300,000 in principal and $361,506.85 in accrued interest from March 21, 2000 through December 31, 2002); in favor of appellee on the frustration of purpose claim, awarded $612,603.81; in favor of appellee on the breach of fiduciary duty and awarded $732,835.88 in compensatory damages;[1] and partially in favor of appellee on the fraud claim. The jury found that Mahan did not engage in fraud in connection with his compensation for 1994 or 1995 and that the excess compensation in 1996-2001 was not the result of fraud, nor was the lack of pro rata distribution in 1996. However, the jury did find that the loans to Mahan in 1999 and 2000 were the result of fraud and awarded $148,229 in compensatory damages and no punitive damages. The jury did not find Mahan liable for punitive damages or attorney fees in connection with the excess compensation or distributions, but did find him liable for attorney fees for the unlawful loans in 1999 and 2000.
 {¶ 9} Both the company and Mahan ("appellants") filed motions for judgment notwithstanding the verdict and new trial, which were overruled. Appellee filed a motion for prejudgment interest, which was granted in part and denied in part. Appellants filed notices of appeal and jointly raise the following assignments of error:
 Assignment of Error I:
The trial court erred as a matter of law and abused its discretion in failing to prevent or correct a damages award that permitted Plaintiff to be compensated twice for the same pecuniary injury.
 Assignment of Error II:
The trial court erred as a matter of law and abused its discretion in permitting the jury to consider and award damages for "frustration of purpose" claims made by Plaintiff.
 Assignment of Error III:
The trial court erred as a matter of law and abused its discretion in permitting the jury to consider and award damages for breach of fiduciary duty claims outside the relevant statute of limitations.
 Assignment of Error IV:
The verdict for excess compensation for 1996 and 1997 is against the manifest weight of the evidence.
 Assignment of Error V:
The trial court abused its discretion in adopting the Magistrate's Decision awarding Prejudgment Interest on Plaintiff's Excess Compensation claims for the years 1999-2000.
 Assignment of Error VI:
The trial court abused its discretion in failing to permit the cross examination of Plaintiff with a portion of the March 21, 2000 board minutes that had been redacted.
 {¶ 10} By the first assignment of error, appellants contend that the trial court erred as a matter of law and abused its discretion in failing to prevent or correct a damages award that permitted appellee to be compensated twice for the same pecuniary injury.
 {¶ 11} In The Toledo Group, Inc. v. Benton Industries, Inc.
(1993), 87 Ohio App.3d 798, 806, the court stated that "[d]amages for a breach of contract are those which are the natural or probable consequence of the breach of contract or damages resulting from the breach that were within the contemplation of both parties at the time of the making of the contract." In giving an award of money damages in a breach of contract action, the intent is to place the injured party in the same position it would have been in had the contract not been breached. SchulkeRadio Productions, Ltd. v. Midwestern Broadcasting Co. (1983),6 Ohio St.3d 436, 439. On appeal, a court may reverse a damage award if it is manifestly against the weight of the evidence and not supported by sufficient evidence. Schendel v. Bradford
(1922), 106 Ohio St. 387, 394.
 {¶ 12} Appellants argue that appellee received a double recovery because the jury determined that appellants breached the contract by not redeeming the shares and awarded appellee the value of her shares as of August 7, 1999, the date of death, which was established by the Shareholder's Agreement as the valuation date, and also awarded damages based upon Mahan's compensation after August 7, 1999. This recovery awarded appellee the full value of the shares owned by the estate plus an additional $194,576 for excess compensation after the date of valuation, plus $296,457 for distributions after the date of valuation, plus $148,228 based upon a claim of fraud for those same distributions. Appellants contend that the valuation included the value of these additional claims, but appellee was awarded an additional $639,261 in damages that duplicated the value already awarded within the valuation of those shares.
 {¶ 13} Appellee's appraiser, Gregory O'Hara, estimated the fair market value of the common equity of the company on a nonmarketable, minority interest, per-share basis as of August 7, 1999. The appraisal utilized a discounted cash-flow approach, which "implicitly measures the earning and dividend paying capacity of the company and incorporates the value of both tangible and intangible assets." (Jt. Ex. 7, at J007-025.) The method is a forward-looking assessment of how the company will do in the future. (Tr. at 832.) It took into account that it was a minority interest which means the stockholder does not have business decision-making control of the company, which is a detriment or discount to that controlling interest value. (Tr. at 818.)
 {¶ 14} During the analysis, the appraiser "normalized" officer compensation. A normalization of expenses involves making additions or subtractions to revenue and expense items to adjust expenses which are considered misaligned with similar expenses of other companies in the industry in an effort to project how the business should be operated in the future. (Tr. at 850.)[2]
The appraiser assumed excess compensation was involved and compared the aggregate level to the financial statement or tax returns. (Tr. at 854; 856.) The appraiser determined that the value of appellee's shares was $2,581.24 per share. (Tr. at 901; Plaintiff's Ex. 82.)
 {¶ 15} The appraisal performed by appellee's appraiser, O'Hara, was a forward-looking valuation that captured the present value as of August 7, 1999, of appellee's shares, which value captured future distributions made after the evaluation date, whether in the form of distributions, loans, or excess compensation, since the appraisal is a valuation of the company beginning on August 7, 1999 and projecting into perpetuity. In describing the evaluation he performed, O'Hara testified at trial that:
* * * in valuing a business, you need to understand prospectively what you are going to get.
So in exchange for some amount of money today, I hope to get future money in the future down the road. For instance, if you are going to value Coca-Cola, you're going to talk to your broker. You pay some dollar price per share in the hopes of receiving dividends from Coca-Cola in the future. With that context, you go into any sort of valuation assignment, and you could negotiate your arrangement around the factors that drive what you think that cash is going to be in the future.
(Tr. at 807-808.)
 {¶ 16} Thus, the evaluation method included any money a shareholder would receive in the future. Any future distributions to the shareholder are accounted for in the valuation. Plus, any excess compensation of Mahan was accounted for in the valuation when the appraiser normalized officer compensation; therefore, the amounts awarded for excess compensation after the valuation had already been accounted for within the valuation ($97,739 for 1999 and $96,837 for 2000). The jury was also permitted to award compensation for the loans in 1999 and 2000 under theories of both breach of fiduciary duty ($296,457) and fraud ($148,229). The loans were included in the appraiser's value of future performance of the company. The award of compensatory damages for each of these claims duplicated recovery of the loss sustained by appellee because the damages are for the same injury arising out of the same duty to appellee. Kerans v. Porter Paint Co.
(1991), 61 Ohio St.3d 486. Such a result is contrary to law.Cincinnati Bell Tel. Co. v. Straley (1988), 40 Ohio St.3d 372;Grange Mut. Cas. Co. v. Columbus (1989), 49 Ohio App.3d 50. Appellants' first assignment of error is well-taken.
 {¶ 17} By the second assignment of error, appellants contend that the trial court erred as a matter of law and abused its discretion in permitting the jury to consider and award damages for "frustration of purpose" claims made by appellee. Frustration of Purpose is defined, in the Restatement of the Law 2d, Contracts (1981) 334, Section 265, as follows:
Where, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event, the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or the circumstances indicate the contrary.
 {¶ 18} See, also, Printing Indus. Assn. of NortheasternOhio, Inc. v. Graphics Arts Internatl. Union, Local No. 56
(N.D.Ohio 1984) 584 F.Supp. 990, 999; American PremierUnderwriters, Inc. v. Marathon Pipe Line Co. (Mar. 20, 2002), Mercer App. No. 10-2001-08; Mahoning Natl. Bank of Youngstown,Ohio v. The State of Ohio (May 27, 1976), Franklin App. No. 75AP-532. However, the doctrine of frustration of purpose is not widely accepted in Ohio. Printing Indus., supra; AmericanPremier Underwriters, supra. Even if we were to apply the doctrine to these facts, the jury should not have considered and awarded damages for a frustration of purpose claim under these circumstances.
 {¶ 19} The trial court permitted testimony by appellee's expert witness regarding the meaning of the 25 percent reduction mandated in the shareholder's agreement regarding the redemption price of the shares. The shareholder's agreement provides, as follows:
3.3.3. * * * In the event the Corporation receives a Representative Objection and a Representative Appraisal within the time specified, 75% of the Representative Appraised Value Per Share shall be deemed to be the Redemption Price Per Share times the number of Shares held by the Representative * * *.
 {¶ 20} Appellee's expert, Michael Nesser, testified that the purpose of the 25 percent reduction was a dispute resolution mechanism designed to protect the company from a high appraisal and to protect the estate from having to file an action in court. (Tr. at 1010-1013.) Appellee argued that since parties were resolving their differences in court, the purpose of the provision failed and appellee should be entitled to 100 percent of the value of the shares rather than 75 percent of the value. Appellants contend that the contract provision is not ambiguous and parol evidence is not admissible, including Nesser's testimony.
 {¶ 21} The question of whether a contract is ambiguous is a question of law. Latina v. Woodpath Dev. Co. (1991),57 Ohio St.3d 212, 214. An appellate court reviews a trial court's resolution of legal issues de novo, without deference to the result that was reached by the trial court. Graham v. DrydockCoal Co. (1996), 76 Ohio St.3d 311, 313. A court should interpret a contract to give effect to the intention of the parties as manifested by the language of the contract.Skivolocki v. East Ohio Gas Co. (1974), 38 Ohio St.2d 244, paragraph one of the syllabus. When the terms of the contract are clear and unambiguous, courts may not create a new contract by finding intent not expressed by the terms. Alexander v. BuckeyePipe Line Co. (1978), 53 Ohio St.2d 241, 245-246. "Common words appearing in a written instrument are to be given their plain and ordinary meaning unless manifest absurdity results or unless some other meaning is clearly intended from the face or overall contents of the instrument." Id.
 {¶ 22} Generally, the parol evidence rule provides, "[A]bsent fraud, mistake or other invalidating cause, the parties' final written integration of their agreement may not be varied, contradicted or supplemented by evidence of prior or contemporaneous oral agreements, or prior written agreements."Galmish v. Cicchini (2000), 90 Ohio.St.3d 22, 27, quoting 11 Williston on Contracts (4th Ed. 1999) 569-570, Section 33:4. Appellee argues that since she is not attempting to vary the terms of the contract, her expert testimony is admissible. However, where the terms of the agreement are clear and unambiguous, this court has specifically held that expert testimony interpreting those terms is improper. Nicholson v.Turner/Cargile (1995), 107 Ohio App.3d 797, 803.
 {¶ 23} In this case, the contract terms are clear and unambiguous. Once the company receives an objection by the estate to the board-determined value, and the estate provides an appraisal within the specified time from a competent and qualified appraiser of closely held corporations, the redemption price is 75 percent of the estate's appraised value per share times the number of shares held by the estate. Being unambiguous, there is no need for expert testimony regarding the 25 percent reduction, and the trial court erred in permitting the jury to consider and award damages for a frustration of purpose claim under these circumstances. Appellants' second assignment of error is well-taken.
 {¶ 24} By the third assignment of error, appellants contend that the trial court erred as a matter of law and abused its discretion in permitting the jury to consider and award damages for breach of fiduciary duty claims outside the relevant statute of limitations. In January 1996, Mahan received a distribution that was not pro rata with the distribution received by Michael Wells. The jury found this unequal distribution was a breach of fiduciary duty and awarded $125,388 (which included a mathematical error and was corrected by the trial court to $93,027). Appellants contend that distributions made after August 10, 1996 were made on a pro-rata basis and, therefore, appellee's cause of action accrued with the January 1996 distribution. Since appellee filed her cause of action on February 26, 2001, it is barred by the four-year statute of limitations for beach of fiduciary duty provided in R.C. 2305.09. The parties agreed at trial that Mahan was out of state for non-business purposes for a period of time which extended the statute of limitations to at least August 10, 1996. (Plaintiff's Ex. 42.) Appellee argues that her claim is not limited to the January distribution and not barred by the statute of limitations because there may be additional days that Mahan was out of the state for non-business purposes, and Michael Wells could not have known whether the distributions were pro rata until the close of 1996 when all the distributions for the year were completed.
 {¶ 25} "The application of a statute of limitations presents a mixed question of law and fact. Determination of when a plaintiff's cause of action accrues is to be decided by the fact finder. But, in the absence of such factual issues, the application of the limitation is a question of law." Cyrus v.Henes (1993), 89 Ohio App.3d 172, 175, reversed on other grounds (1994), 70 Ohio St.3d 640. The jury found the claim was not barred by the statute of limitations because it awarded damages. (Jury Interrogatory 7.) The jury also found that this non pro-rata distribution was not the result of fraud. (Jury Interrogatory 12.)
 {¶ 26} A claim for breach of fiduciary duty is subject to the four-year statute of limitations provided in R.C. 2305.09.Herbert v. Banc One Brokerage Corp. (1994), 93 Ohio App.3d 271;Crosby v. Beam (1992), 83 Ohio App.3d 501, 509; Karlen v.Carfangia (June 2, 2001), Trumbell App. No. 2000-T-0081. R.C.2305.09 provides, as follows:
An action for any of the following causes shall be brought within four years after the cause thereof accrued:
(A) For trespassing upon real property;
(B) For the recovery of personal property, or for taking or detaining it;
(C) For the relief on the ground of fraud;
(D) For an injury to the rights of the plaintiff not arising on contract nor enumerated in sections 2305.10 to 2305.12, 2305.14
and 1304.35 of the Revised Code.
If the action is for trespassing under ground or injury to mines, or for the wrongful taking of personal property, the causes thereof shall not accrue until the wrongdoer is discovered; nor, if it is for fraud, until the fraud is discovered.
 {¶ 27} The jury specifically found that the statute of limitations was not extended beyond the agreed August 10, 1996 date because they found there were no dates other than those provided in Plaintiff's Exhibit 42 when Mahan was out of the state for non-business purposes. (See Jury Interrogatory 14.)
 {¶ 28} The discovery rule is applied in some circumstances to calculate when a cause of action accrues for purposes of the statute of limitations. "Depending on the claim and the applicable statute, the date of discovery may toll the running of the governing statute of limitations until the plaintiff discovers or, in the exercise of reasonable care, should have discovered the complained-of injury." Investors REIT One v.Jacobs (1989), 46 Ohio St.3d 176, 180. R.C. 2305.09(D) contains its own discovery rule for certain torts, such as fraud and conversion, and the legislature's failure to include a discovery rule for all the tort claims under R.C. 2305.09 implies that it was not the legislature's intent to apply the discovery rule to such excluded claims. Id. at 181. See Kirsheman v. Paulin
(1951), 155 Ohio St. 137, 146 (explaining expressio unius est exclusio alterius.) In Investors REIT One, the Supreme Court of Ohio determined that the General Assembly has not adopted a discovery rule applicable to general negligence claims arising under R.C. 2305.09. Thus, the discovery rule is inapplicable to claims of breach of fiduciary duty. See Jim Brown Chevrolet,Inc. v. S.R. Snodgrass, A.C. (2001), 141 Ohio App.3d 583, 587;Helman v. EPL Prolong, Inc. (2000), 139 Ohio App.3d 231, 249;Investors REIT One, supra; Holloway v. Holloway Sportswear,Inc. (June 7, 2001), Shelby App. No. 17-98-20.
 {¶ 29} A claim for breach of fiduciary duty accrues when the claimant's interest is impaired by such a breach, rather than when the breach is discovered. Jim Brown Chevrolet, supra;Investors REIT One, supra; Holloway, supra. Thus, the distribution in January 1996 cannot be the basis for the award of damages for breach of fiduciary duty because it is outside of the statute of limitations. Appellants' third assignment of error is well-taken.
 {¶ 30} By the fourth assignment of error, appellants contend that the verdict for excess compensation for 1996 and 1997 is against the manifest weight of the evidence. Judgments which are supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence. C.E. Morris Co. v. Foley Construction Co. (1978),54 Ohio St.2d 279, syllabus. In order to find that the trial court abused its discretion, we must find more than an error of law or judgment, an abuse of discretion implies that the court's attitude is unreasonable, arbitrary or unconscionable. Blakemorev. Blakemore (1983), 5 Ohio St.3d 217, 219. Most instances of an abuse of discretion result in decisions that are unreasonable as opposed to arbitrary and capricious. AAAA Enterprises, Inc. v.River Place Community Urban Redevelopment Corp. (1990),50 Ohio St.3d 157. A decision that is unreasonable is one that has no sound reasoning process to support it.
 {¶ 31} The jury found Mahan received excess compensation in the years 1996 and 1997 and awarded damages of $59,578 and $23,452, respectively. The jury's finding that Mahan received excessive compensation for the years 1996 and 1997 was supported by some competent, credible evidence. Although appellants called a witness to testify that Mahan's compensation was reasonable, Richard F. Sharpnack also testi-fied regarding how much Mahan's compensation exceeded industry standards. Sharpnack used Personnel Administrative Services ("PAS") publication almost exclusively as a source of industry information. (Tr. at 1112.) PAS is a company in the Detroit area that publishes construction industry compensation practices. (Landon R. Funsten depo. at 96.) All of Mahan's compensation, including salary and bonus, was higher than the 75 percentile of presidents of companies in the revenue range $50 to $100 million in the industry. (Tr. at 1143-1145.) In 1996, Mahan's compensation was $579,332 and the 50th percentile was $196,000 and the 75th percentile was $275,000. In 1997, Mahan's compensation was $453,329 and the 50th percentile was $226,500 and the 75th percentile was $295,519. (Tr. at 1145-1148; Ex. 83.) Also, the company had an Officers' Draw Account, which was an account by which the personal portion of the credit card charges was paid by the company. (Tr. at 124.) The total amount of officer draw account paid by the company in 1997 was $355,842.16. (Tr. at 128.) Mahan was the only officer to use the account. (Tr. at 140.)
 {¶ 32} Bradford Eldridge was a partner in an accounting and business consulting firm, GBQ Partners, who did an evaluation of Mahan Construction Company on behalf of Rebecca Mahan in connection with divorce proceedings. (Tr. at 682.) Eldridge testified that an evaluator would not typically normalize compensation when evaluating a minority interest unless the company owner's compensation is so large compared to the industry average, as in this case. (Tr. at 708.) Thus, there is competent, credible evidence to support the jury's finding that Mahan received excessive compensation for the years 1996 and 1997.
 {¶ 33} Appellants argue that Michael Wells and Mahan settled this dispute in January 1998 and there was an accord and satisfaction of this claim, and thus, the verdict is contrary to the weight of the evidence. Generally, accord and satisfaction is an affirmative defense to a claim for money damages. "An accord is a contract between a debtor and a creditor in which the creditor's claim is settled in exchange for a sum of money other than that which is allegedly due. Satisfaction is the performance of that contract." Allen v. R.G. Indus. Supply (1993),66 Ohio St.3d 229, 231. The Allen Court continued, as follows:
When an accord and satisfaction is pled by the defendant as an affirmative defense, the court's analysis must be divided into three distinct inquiries. First, the defendant must show that the parties went through a process of offer and acceptance-an accord. Second, the accord must have been carried out-a satisfaction. Third, if there was an accord and satisfaction, it must have been supported by consideration.
Two essential safeguards built into the doctrine of accord and satisfaction protect creditors or injured parties from overreaching debtors or tortfeasors: (1) there must be a good-faith dispute about the debt, and (2) the creditor must have reasonable notice that the check is intended to be in full satisfaction of the debt.
Allen, at paragraphs one and two of the syllabus.
 {¶ 34} Generally, if the facts are clear and undisputed, the court may decide the issue of whether there has been an accord and satisfaction; however, it is a question for the trier of fact if there is a factual dispute. Duplantie v. Natl. Cash RegisterCo. (1932), 42 Ohio App. 112; Stalter Essex Coal Co. v.Peoples (1927), 28 Ohio App. 162. In this case, the jury rejected appellants' accord and satisfaction defense.
 {¶ 35} Appellants argued that Michael Wells approached Mahan in January 1998 and discussed his dissatisfaction over Mahan's excessive compensation. Wells had hired David Weimer to investigate his own compensation. (Tr. at 590-591.) However, Weimer testified that Wells had told him he received a $60,000 check on January 20, 1998, a tax distribution, and later received a check for $264,000. Wells told Weimer since Wells was making progress, Weimer should do no further work. (Tr. at 611.) William Weimer, David's brother, was Michael Wells' investment advisor and friend. (Tr. at 638-640.) William testified that the $264,000 check and subsequent checks were to compensate for what Wells had not received earlier. (Tr. at 648.) Mahan testified that a million dollar distribution was given by the company in 1998, and Wells' share was the $264,000. (Tr. at 1523.)
 {¶ 36} As stated in Allen, an accord and satisfaction requires consideration. In this case, there was no consideration given. Michael Wells only received his proportionate share of the shareholder distributions and, thus, there was no consideration. See Rhoades v. Rhoades (1974), 40 Ohio App.2d 559, 562 ("It is elementary that neither the promise to do a thing, nor the actual doing of it will constitute a sufficient consideration to support a contract if it is merely a thing which the party is already bound to do, either by law or a subsisting contract with the other party.") The jury properly rejected appellants' accord and satisfaction defense. Appellants' fourth assignment of error is not well-taken.
 {¶ 37} By assignments of error five and six, appellants contend that the trial court abused its discretion in adopting the magistrate's decision awarding prejudgment interest on appellee's excess compensation claims for the years 1999-2000 and that the trial court abused its discretion in failing to permit the cross-examination of appellee with a portion of the March 21, 2000 board minutes that had been redacted. These assignments of error have been rendered moot by our ruling on the first assignment of error.
 {¶ 38} For the foregoing reasons, appellants' first, second and third assignments of error are sustained, the fourth assignment of error is overruled, and the fifth and sixth assignments of error are moot. Based upon our resolution of the assignments of error, we affirm in part and reverse in part the judgment of the Franklin County Court of Common Pleas and remand this cause to that court.
 {¶ 39} When a damages award is manifestly excessive, but not the result of passion or prejudice, a court has the inherent authority to remit the award to an amount supported by the weight of the evidence. Wightman v. Consol. Rail Corp. (1999),86 Ohio St.3d 431, 444. Four criteria are necessary for a court to order a remittitur: "(1) unliquidated damages are assessed by a jury, (2) the verdict is not influenced by passion or prejudice, (3) the award is excessive, and (4) the plaintiff agrees to the reduction in damages." Dardinger v. Anthem Blue Cross BlueShield, 98 Ohio St.3d 77, 2002-Ohio-7113. If the prevailing party refuses to accept the remittitur, a court must order a new trial. An appellate court "has the same unlimited power and control of verdicts and judgments as the trial court and may weigh the evidence and exercise an independent judgment upon questions of excessive damages and when no passion or prejudice is apparent may modify and affirm the judgment by ordering aremittitur with the consent of the prevailing party." ChesterPark Co. v. Schulte (1929), 120 Ohio St. 273, paragraph five of the syllabus. Thus, an appellate court may order a remittitur to the amount warranted by the evidence if it determines that a damages award is not supported by the evidence.
 {¶ 40} In this case, we determined that no damages may be awarded for excess compensation after the date of valuation, ($194,576), or for distributions after the date of valuation, ($296,457), or for fraud claims based upon distributions after the date of valuation ($148,228).+ Appellee may only receive 75 percent of the valuation of her shares, not 100 percent as she claimed because there are no damages for frustration of purpose under these circumstances. Appellee also may not receive damages for the breach of fiduciary duty claims which were outside of the statute of limitations ($125,388, which included a mathematical error and was corrected by the trial court to $93,027). Thus, appellee is only entitled to receive 75 percent of the valuation of her shares and the jury damages awarded for excess compensation for 1996 and 1997 ($59,578 and $23,452), plus interest, minus the $200,000 advance which was paid on December 30, 1999.
 {¶ 41} Upon remand to the trial court, appellee shall inform the trial court whether or not she accepts the remittitur. If she does not accept, the trial court shall conduct a new trial on the issue of damages. If she does accept, the trial court shall enter judgment specifying the appropriate amount of damages in accordance with law and this opinion.
Judgment affirmed in part, reversed in part, and causeremanded with instructions.
Klatt, P.J., and Brown, J., concur.
[1] The breach of fiduciary duty damages were divided by the following findings by the jury: On the excessive compensation claims, the jury found Mahan received excessive compensation for 1996 in the amount of $225,332, for an award of $59,578 to appellee as Michael Wells' percentage of ownership; for 1997, Mahan received excessive compensation in the amount of $88,701, which relates to $23,452 as Wells' ownership percentage; for 1998 Mahan received $243,795 in excessive compensation, which relates to $65,825 to appellee; in 1999 Mahan received $295,551 in excessive compensation, which relates to $97,739 to appellee; in 2000 Mahan received $292,824 in excessive compensation, which relates to $96,837 to appellee; in 2001 the jury found Mahan did not receive excessive compensation. The jury found Mahan received distributions in 1996 that were not made on a pro rata basis and awarded $125,388 (which the trial court corrected to $92,947.88). The jury found that in 1999 and 2000 Mahan received loans that were a breach of fiduciary duty and awarded $296,457.
[2] Appellee argues that since appellants refused to provide information regarding officers' compensation, duties, shareholders, etc., until after the appraisal was completed, their appraiser did not have sufficient information to complete the appraisal and had to look to third-party information in the marketplace including public companies and various studies regarding compensation. (Tr. at 852.)