OPINION
{¶ 1} Defendant-appellant, Parking Company of America, Inc. ("PCA"), appeals from a judgment of the Franklin County Court of Common Pleas awarding plaintiff-appellee, Atelier District, LLC ("Atelier"), damages in the amount of $488,006.51. Because the trial court erred in awarding Atelier $27,000 for demolition performed pursuant to a city of Columbus emergency order, we vacate that portion of the trial court's *Page 2 
judgment but affirm the remainder of the judgment, as competent, credible evidence supports it and it is in accordance with law.
I. Facts {¶ 2} Atelier is a business entity that owns real estate in Columbus; Bradley Mindlin, its manager, is an attorney with experience in real estate matters. PCA is a national corporation with 30 years experience owning and operating parking lots throughout the United States. Martin Chavez, PCA's president and co-owner, has a master's degree in business administration, real estate and finance; he approves PCA's leases. Timothy Chavez ("Chavez"), PCA's Senior Operations Manager, is responsible for its operations in Columbus, including contract negotiations and securing governmental approval and permits for PCA's work.
 {¶ 3} On December 21, 1995, PCA and Columbus Central Properties, Ltd. ("CCP"), the parent company of Atelier, executed a five-year lease agreement (the "Lease") that PCA drafted; its term began on January 1, 1996 and ended December 31, 2000. Pursuant to the Lease, CCP agreed to lease to PCA six lots, described as Lots 40, 41, 42, 43, 44 and 45, that CCP owned in a designated historic redevelopment area in Columbus known as the Warehouse District. In return, PCA agreed to pay CCP a guaranteed annual rent of no less than $153,000 to use CCP's property for parking lot operations PCA would manage on its own behalf.
 {¶ 4} The Lease also provided under the section entitled "Legal Compliance," that both parties agreed "to comply with all pertinent city, state and federal statutes herein applicable." They further agreed PCA "shall obtain at its own sole cost, any required licenses or permits in carrying on its business operations on the Premises and provisions *Page 3 
hereof." Under the section entitled "Miscellaneous," the parties agreed the "Lease sets forth the complete agreement of the parties hereto and no modification hereof shall be binding unless in writing and signed by the parties hereto."
 {¶ 5} On August 8, 2000, Chavez sent Mindlin a proposal to extend the Lease, "to upgrade the parking lots to make the area more cohesive" with Atelier's building improvements, and "to assure a more appealing parking environment for the tenants and general public alike." On November 2, 2000, Atelier and PCA executed an Addendum renewing the Lease for an additional five-year term to begin on January 1, 2001 and end on December 31, 2005. The Addendum incorporated all the terms, provisions, and conditions of the Lease except where the Addendum specifically modified or amended them. Pursuant to Section 3 of the Addendum (the "Improvements" provision), PCA agreed to pay Atelier a guaranteed annual rent of no less than $204,000 and to "make improvements" to the parking lots "which shall include development, paving, demolition and fencing, such improvements to be more particularly described in Exhibit B, attached hereto and made a part hereof."
 {¶ 6} Except for Lot 41 where no improvements were planned, Exhibit B described the "improvements" to be made on each lot as simply "development," "demolition," "paving," "fencing" or "new decorative fencing." The Addendum neither further described "improvements" nor contained a "time is of the essence" provision or a due date by which the improvements were to be completed. Exhibit B set forth cost estimates for the improvements on each respective lot, stating the "total" sum of $160,578 for all the lot improvements "representsestimate [sic] of costs, to be determined later based on three or more competitive bids." (Emphasis sic.) Neither the Addendum nor *Page 4 
Exhibit B states that $160,578 is a cap or the maximum amount PCA must spend for the lot improvements. PCA drafted the Addendum and Exhibit B; PCA's Chavez prepared the cost estimates reflected in Exhibit B.
 {¶ 7} Aware that PCA needed approval from the city's Downtown Development Commission ("DDC"), as well as necessary permits, before PCA's development work on the lots could proceed, the parties in February 2001 submitted proposed development plans for DDC approval. Chavez acknowledged knowing then that at least one DDC member was opposed to demolishing buildings to create surface parking; he also knew the DDC either might require revisions before approving the plans or might not approve the plans at all. The DDC tabled its decision on the proposed improvements to Lots 43 and 44 while it considered various options relating to demolition work on the lots, including possible preservation of a historical symbol or fa Ç ade of one of the buildings.
 {¶ 8} As Addendum Section 3 and Exhibit B required, PCA subsequently completed development, paving and fencing work on Lots 40, 42 and 45 at a cost of $154,890, almost twice PCA's estimate of $81,978 reflected in Exhibit B. Addendum Section 3 and Exhibit B also required PCA to make "demolition, paving fencing" improvements on Lots 43 and 44, an undertaking PCA estimated in Exhibit B to cost $78,600. The parties agreed the work included demolition of two vacant buildings on Lots 43 and 44, followed by paving and fencing work to combine the two lots into one parking lot.
 {¶ 9} In May 2003, while the DDC was still considering the demolition work proposed for Lots 43 and 44, another city of Columbus agency issued an emergency order declaring the two buildings on Lots 43 and 44 an "unreasonable and imminent *Page 5 
threat to the life and safety of the surrounding area" and a violation of city code. The city ordered that, unless the buildings were promptly reinforced or demolished, the city would demolish them at one and one-half times the cost. Without notice to PCA, Atelier had the buildings razed five days later at a cost of $27,000.
 {¶ 10} On February 2, 2004, the DDC issued a "Certificate of Appropriateness" approving revised development plans for Lots 43 and 44, a prerequisite to PCA's obtaining any necessary zoning clearance and permits for the paving and fencing improvements on the lots. On April 27, 2004, Atelier sent a letter to PCA requesting its assurance it would "do all work under the Lease to parking lots 43 and 44." PCA refused, believing it could not recoup its costs for the improvements over the remaining term of the Addendum, particularly because the parking lots generated less revenue than expected and PCA experienced cost overruns. The same day, Atelier gave notice of default to PCA pursuant to the Lease.
 {¶ 11} On August 10, 2004, Atelier filed a complaint against PCA claiming PCA breached its contract with Atelier by (1) failing to undertake and complete the demolition, paving, and fencing work on Lots 43 and 44 as the Lease and Addendum required and (2) taking excessive credits for tenant parking spaces. PCA filed an answer and a counterclaim. Specifically, PCA claimed that because neither party contemplated the DDC would not promptly approve the demolition work and other improvements to Lots 43 and 44, the parties' agreement should be reformed to release PCA from any obligation to perform the improvements. PCA also claimed Atelier breached PCA's contractual right of first refusal by leasing the premises at issue to a third party after PCA's lease expired on December 31, 2005. *Page 6 
 {¶ 12} A three-day bench trial began on December 11, 2006. In a January 26, 2007 judgment entry, the trial court concluded (1) the Lease and Addendum constitute a valid, enforceable contract between the parties; (2) the Addendum obligated PCA to complete demolition, paving and fencing work on Lots 43 and 44; (3) PCA breached the Addendum by failing to complete any demolition, paving or fencing work upon Lots 43 and 44; and (4) PCA is liable to Atelier for damages flowing from its breach. The court accordingly awarded damages to Atelier in the amount of $488,006.51 and denied PCA's counterclaims.
II. Assignment of Errors {¶ 13} PCA appeals, assigning the following errors:
 FIRST ASSIGNMENT OF ERROR — The trial court erred in holding that PCA breached the agreement because PCA was excused from performance.
 SECOND ASSIGNMENT OF ERROR — The trial court erred in holding that PCA breached the agreement because the parties never had a meeting of the minds.
 THIRD ASSIGNMENT OF ERROR — The trial court erred in granting summary judgment in favor of Atelier on the affirmative defenses of waiver, laches, and time is of the essence.
 FOURTH ASSIGNMENT OF ERROR — The trial court erred in awarding Atelier the costs for the demotion of the buildings because Atelier was obligated under the parties' agreements to pay for all government requirements.
 FIFTH ASSIGNMENT OF ERROR — The trial court erred in denying PCA's counterclaim for breach of the right of first refusal.
 SIXTH ASSIGNMENT OF ERROR — The trial court erred in awarding Atelier damages because the scope of the award was not what the parties contemplated at the time of their *Page 7 
agreements, Atelier failed to mitigate its damages, and Atelier's evidence regarding damages was speculative.
III. Breach of Contract {¶ 14} We first address PCA's second assignment of error, in which PCA contends no meeting of the minds occurred because the parties were mutually mistaken as to the scope and cost of the "paving" improvements for Lots 43 and 44. PCA asserts, that as a result, the Addendum is not an enforceable contract, and PCA's refusal to complete any of the paving and fencing improvements on those lots did not constitute a breach of contract.
 {¶ 15} A contract is a promise or set of promises for the breach of which the law gives a remedy, or the performance of which the law recognizes as a duty. NetJets, Inc. v. Binning, Franklin App. No. 04AP-1257, 2005-Ohio-3934, at ¶ 8, citing Episcopal Retirement Homes,Inc. v. Ohio Dept. of Indus. Relations (1991), 61 Ohio St.3d 366, 369. For an agreement to be enforceable, the parties must consent to its terms, the agreement must be definite and certain, and a meeting of the minds must exist as to the agreement's essential terms. Kostelnik v.Helper, 96 Ohio St.3d 1, 2002-Ohio-2985, at ¶ 16; Motorists Mut. Ins.Co. v. Columbus Finance, Inc., 168 Ohio App.3d 691, 2006-Ohio-5090, at ¶ 7.
 {¶ 16} Questions regarding the existence of a contract and its meaning are questions of law subject to de novo review. NetJets, at ¶ 7;Saunders v. Mortensen, 101 Ohio St.3d 86, 2004-Ohio-24, at ¶ 9. Leases are contracts and are subject to traditional rules of contract interpretation. Mark-It Place Foods, Inc. v. New Plan Excel RealtyTrust, Inc., 156 Ohio App.3d 65, 2004-Ohio-411, at ¶ 29. Courts thus interpret lease provisions according to traditional contract principles.Bucher v. Schmidt, Hancock App. No. 5-01-48, *Page 8 
2002-Ohio-3933, at ¶ 13. "Contracts are to be interpreted so as to carry out the intent of the parties, as that intent is evidenced by the contractual language." Skivolocki v. E. Ohio Gas Co. (1974),38 Ohio St.2d 244, paragraph one of the syllabus; Shifrin v. Forest City Ent.,Inc. (1992), 64 Ohio St.3d 635.
 {¶ 17} So long as a contract is clear and unambiguous, the rights and obligations of the parties are determined on the plain language of the agreement. Bucher, citing Cleveland Trust Co. v. Snyder (1978),55 Ohio App.2d 168; Nationwide Mut. Fire Ins. Co. v Guman Bros. Farm (1995),73 Ohio St.3d 107, 108. Whether a contract is ambiguous is a question of law. Ohio Historical Soc. v. Gen. Maintenance Eng. Co. (1989),65 Ohio App.3d 139, 146. The meaning of the words in an ambiguous contract becomes a question of fact. Id. Extrinsic evidence is admissible to ascertain the parties' intentions, and the trial court's determination will not be overturned absent an abuse of discretion. Id. at 147, citingC.E. Morris Co. v. Foley Constr. Co. (1978), 54 Ohio St.2d 279;Shifrin, supra, at syllabus. The language in an ambiguous contract will be construed strictly against the party who prepared the contract or selected the language. Cent. Realty Co. v. Clutter (1980),62 Ohio St.2d 411; McKay Machine Co. v. Rodman (1967), 11 Ohio St.2d 77, 80.
 {¶ 18} PCA drafted the Lease, Addendum and Exhibit B. None of the documents define or describe the term "paving." Because the term is susceptible to different meanings, it is ambiguous. The trial court thus properly admitted parol evidence to ascertain the parties' intent about the "paving" on Lots 43 and 44. See Shifrin, supra; Dalicandro v.Morrison Rd. Dev. Co., Inc. (Apr. 17, 2001), Franklin App. No. 00AP-619. *Page 9 
 {¶ 19} Mindlin, Atelier's manager, testified he had no specific preconception about the scope of the paving and fencing improvements for Lots 43 and 44. According to Mindlin, the improvements were simply to provide a cohesive parking lot, and PCA was to "do the work pursuant to code and law." (Tr. 179-180.) Both a licensed civil engineer and a commercial asphalt construction contractor, each of whom is familiar with city of Columbus commercial paving and development requirements, testified for Atelier that the city would not permit a mere "asphalt overlay" to be installed on Lots 43 and 44. Rather, for the "paving and fencing" improvements to comply with city of Columbus requirements, both engineering work and a "comprehensive plan" was necessary, including engineered plans, a hydrology plan and installation of an internal drainage system, excavation and site preparation of the entire surface area of the lots, installation of underground utilities and the parking lot surface, construction of a concrete entry apron and brick pillars, removal and construction of concrete curbing and sidewalks with handicap ramps, fencing, parking lot lighting, and landscaping.
 {¶ 20} Chavez admitted the lot improvements were meant to upgrade the parking lots to make a more appealing parking environment cohesive with the extensive renovations and investments Atelier made in buildings it owned in the surrounding area. He further conceded the scope of the "paving" improvements PCA was required to make would depend on the various governmental prerequisites for making the improvements on Lots 43 and 44. Although he maintained PCA merely had to install an "asphalt overlay" on the lots to fulfill its obligations under the Addendum, he also acknowledged the "paving" work required engineering work, a "comprehensive plan," a hydrology plan for internal drainage, electrical and lighting work, and construction of brick pillars. PCA's own paving *Page 11 
expert testified that the "paving" work on Lots 43 and 44 included installation of pillars, concrete curbs, landscaping, and fencing, all based on documents and information PCA provided to him.
 {¶ 21} The trial court concluded, and PCA does not dispute, that the Lease and Addendum represent contracts freely negotiated, at arm's length, between two sophisticated business entities. Construing ambiguities in the written documents against PCA as the drafter, and finding Atelier's evidence to be more credible, the court concluded the "Improvements" provision is a valid and enforceable provision that obligated PCA to complete the "paving and fencing" work on Lots 43 and 44. The court noted Chavez was aware engineering work and a "comprehensive plan," including a hydrology plan, would be required for the work on Lots 43 and 44.
 {¶ 22} Civil "[judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." C.E. Morris Co., at syllabus. We afford every reasonable presumption in favor of the trial court's judgment and findings of fact, and evidence susceptible of more than one interpretation is construed consistently with the trial court's judgment. Gerijo, Inc. v.Fairfield (1994), 70 Ohio St.3d 223, 226, certiorari denied (1995), 513 U.S. 1150. See, also, Seasons Coal Co. v. Cleveland (1984),10 Ohio St.3d 77, 80.
 {¶ 23} Competent, credible evidence supports the trial court's determination that PCA was contractually obligated to perform "paving" work on Lots 43 and 44 pursuant to the "Improvements" provision. As the trier of fact, the trial court appropriately weighed the conflicting evidence on the meaning of the term "paving," and it found Atelier's evidence *Page 11 
to be more credible. If PCA mistook "paving" to mean only "asphalt overlay" on Lots 43 and 44, the mistake was unilateral and did not relieve PCA of its duty to perform under the contract. See Ohio TurnpikeComm. v. Alexanderian, Wood App. No. WD-05-060, 2006-Ohio-4301, at ¶ 12 (concluding a unilateral mistake does not relieve a party of its obligations under a contract where the mistake is the result of the party's own negligence). Because PCA undisputedly refused and failed to perform the "paving and fencing" improvements on Lots 43 and 44, it breached its obligations under the "Improvements" provision. PCA's second assignment of error is overruled.
IV. Excused Performance {¶ 24} PCA's first assignment of error contends that, even if a valid, enforceable contract existed, PCA did not breach the contract because its performance was excused. Specifically, PCA claims its duty to perform the paving and fencing improvements on Lots 43 and 44 was excused because: (1) Atelier hindered PCA's ability to perform the improvements, (2) Atelier frustrated PCA's ability to promptly perform, (3) conditions precedent to PCA's performance were not satisfied, and (4) Atelier materially breached the contract.
A. Hindrance of PCA's Ability to Perform {¶ 25} PCA first contends it was excused from performing the improvements on Lots 43 and 44 because Atelier hindered PCA's performance. When the parties submitted their proposal for the improvements to Lots 43 and 44 to the DDC in February 2001, Chavez initially took the lead in securing the DDC's approval. PCA argues that shortly after the DDC tabled its decision on the improvements, Atelier assumed full responsibility *Page 12 
for securing the DDC's approval and effectively removed PCA from the approval process when Mindlin allegedly told Chavez, "Tim, you are out."
 {¶ 26} At trial, Mindlin denied so stating. Chavez, who testified Mindlin made the statement to him, admitted the alleged statement referred to Chavez personally and did not absolve PCA of its responsibility under Section 8 of the Lease to secure necessary governmental approval and required licenses or permits for the improvements on Lots 43 and 44. He also admitted that nothing in writing absolved PCA of any of its obligations pursuant to the Lease and Addendum. Chavez' testimony and Section 8 of the Lease constitute competent, credible evidence that PCA was not relieved of its obligation to secure the DDC's approval and the necessary permits to make the improvements on Lots 43 and 44.
 {¶ 27} PCA next contends Atelier hindered PCA's performance because Atelier refused to meet the DDC's "conditions" for approval of the planned improvements on Lots 43 and 44. PCA claims the DDC would have approved the demolition work on those lots, and thus allowed PCA to proceed with the improvements, if Atelier had agreed to install a historical symbol or fa Ç ade of one of the buildings on the lots. Contrary to PCA's contention, Chavez at trial testified the DDC had no such "condition" for its approval.
 {¶ 28} Based solely on Chavez' trial testimony, the trial court could reasonably conclude Atelier did not hinder PCA's performance of the improvements to Lots 43 and 44.
B. Time was of the Essence — Frustration of Purpose {¶ 29} PCA acknowledges the Addendum does not contain an express provision stating "time is of the essence." PCA seeks to imply one because, it asserts, one of the *Page 13 
principal purposes in executing the Addendum was not only so PCA could complete the improvements to Lots 43 and 44 as quickly as possible and recoup its costs for the improvements, but also so Atelier could realize the enhanced value of additional parking spaces for its tenants. PCA further argues Atelier frustrated the Addendum's purpose because it removed PCA from the DDC approval process and protracted the approval process by refusing to meet the DDC's conditions for demolition.
 {¶ 30} Even were we to accept the "frustration of purpose" doctrine, we could not conclude that PCA's contractual obligations were excused because, as noted, competent, credible evidence demonstrates Atelier neither removed PCA from the DDC approval process nor refused to meet any "condition" for the DDC's approval. See Wells v. C.J. Mahan Constr.Co., Franklin App. No. 05AP-180, 2006-Ohio-1831, at ¶ 18, appeal not allowed, 111 Ohio St.3d 1411, 2006-Ohio-5083 (noting "frustration of purpose" doctrine is not widely accepted in Ohio). PCA's claim that Atelier frustrated PCA's ability to promptly perform its obligations under the contract is without merit.
 {¶ 31} PCA next claims a "time is of the essence" term is necessarily implied in the parties' agreement. Generally, the time for performance is not of the essence unless either the parties include an express stipulation to that effect or such a requirement can be implied from the nature or circumstances of the contract. Brown v. Brown (1993),90 Ohio App.3d 781, 784; see, also, Truetried Service Co. v. Hager (1997),118 Ohio App.3d 78, 83 (applying contract construction principles to lease agreements, including construing provisions against the party who prepared it).
 {¶ 32} Here, the parties, by an express integration provision, limited their agreement to the written contract. See Aultman Hosp. Assn. v.Comm. Mut. Ins. Co. *Page 14 
(1989), 46 Ohio St.3d 51, 54. In neither the Lease nor Addendum did PCA include any provision indicating that time was of the essence. In the absence of such a provision, the "law will not insert by construction for the benefit of one of the parties an exception or condition which the parties either by design or neglect have omitted from their own contract when the lease of commercial property is involved."Truetried, supra, at 86; Aultman Hosp. Assn., supra, at 53 (noting "[i]ntentions not expressed in the writing are deemed to have no existence and may not be shown by parol evidence").
 {¶ 33} Moreover, Chavez testified he expected the DDC's opposition to the proposed demolition work, and he acknowledged PCA had no guarantee the DDC would approve the proposed lot improvements. With that knowledge, PCA, if it desired to absolve itself of liability in the event the DDC delayed or denied its approval, could have sought to include a term in the Addendum that "time is of the essence." Absent such a provision, PCA's performance was not excused due to any delay that occurred in obtaining the DDC's approval for the improvements on Lots 43 and 44.
C. Conditions Precedent {¶ 34} PCA contends it was excused from performing the improvements to Lots 43 and 44 because two conditions precedent to PCA's performance were not satisfied: (1) the DDC failed to "promptly" approve the demolition of the buildings on Lots 43 and 44 and (2) three competitive bids were not obtained for the improvements to those lots.
 {¶ 35} A condition precedent is a condition that must be performed before obligations in the contract become effective. Mumaw v. Western Southern Life Ins. Co. (1917), 97 Ohio St. 1, 11. Essentially, a condition precedent requires that an act must take place before a duty to perform a promise arises. If the condition is not fulfilled, the *Page 15 
parties are excused from performing. Id. To determine whether the parties intended a condition precedent, we consider the language of the contract. Id.
 {¶ 36} Here, the failure of the Addendum to mention DDC approval, let alone its "prompt" approval, suggests the parties did not intend it to be a condition precedent. Moreover, Section 8 of the Lease provides PCA was obliged to "obtain at its sole cost, any required licenses or permits in carrying on its business operations on the premises and provisions hereof." "`Ordinarily, when one contracts to render a performance for which a government license or permit is required, it is his duty to get the license or permit so that he can perform. The risk of inability to obtain it is on him; and its refusal by the government is no defense in a suit for breach of his contract.'" Security SewageEquipment Co. v. McFerren (1968), 14 Ohio St.2d 251, 254, citing 6 Corbin on Contracts 435, Section 1347. Because PCA assumed the responsibility to obtain any required licenses or permits, it bore the risk that the government would delay in issuing them. Although the DDC had to give its approval before PCA could make the improvements on Lots 43 and 44, PCA failed to demonstrate that its "prompt" approval was a condition precedent to PCA's contractual obligations.
 {¶ 37} Similarly unpersuasive is PCA's argument that Atelier had to procure three competitive bids before PCA was obligated to make the improvements on Lots 43 and 44. PCA agreed to complete the lot improvements pursuant to the "Improvements" provision and Exhibit B without including any "cap" or "maximum" on the amount it must spend to complete the improvements. Therefore, obtaining competitive bids before it undertook its obligation to complete the lot improvements was in PCA's own best interest and its sole responsibility. *Page 16 
 {¶ 38} Accordingly, PCA's performance was not excused by the failure of conditions precedent.
D. Atelier Materially Breached the Agreement {¶ 39} PCA asserts it was excused from performing the improvements to Lots 43 and 44 because Atelier materially breached the parties' contractual agreement when it failed to comply with the DDC's requirement that a fa Ç ade be installed to one of the buildings on those lots. PCA contends the DDC would have approved the demolition work on the lots if the building fa Ç ade were installed, but Atelier refused to pay for installing the fa Ç ade and thus violated paragraph 10 of the Lease, excusing PCA from performance. PCA merely rehashes its argument that Atelier "hindered PCA's performance." Because the argument is without merit, PCA was not excused from making the improvements to Lots 43 and 44 due to breach of the parties' agreement.
 {¶ 40} PCA's first assignment of error is overruled. V. Defenses ofWaiver and Laches
 {¶ 41} Before trial, Atelier moved for partial summary judgment, requesting that the "Improvements" provision be declared enforceable as a valid contractual provision. In its third assignment of error, PCA asserts the trial court erred in granting summary judgment against PCA's "affirmative defenses" of waiver, laches, and "time is of the essence" that PCA raised in opposition to Atelier's motion.
 {¶ 42} Preliminarily, contrary to its assertion on appeal, PCA did not raise a "time is of the essence" affirmative defense in its memorandum contra Atelier's motion, and the trial court did not grant summary judgment against the defense. Accordingly, we do not review PCA's claim to the extent it asserts such error. *Page 17 
 {¶ 43} PCA's memorandum contra, however, asserted that "waiver" and "laches" estopped Atelier from enforcing the "Improvements" provision. Specifically, PCA argued Atelier "waived" its right to claim PCA breached the provision because Atelier waited until April 27, 2004 to demand that PCA make the improvements on Lots 43 and 44. PCA also contended "laches" barred Atelier from claiming a breach because Atelier unreasonably delayed enforcing the provision by waiting until April 27, 2004 to demand assurance that PCA would perform.
 {¶ 44} "Waiver," as applied to contracts, is a voluntary relinquishment of a known right. State ex rel. Wallace v. State Med. Bd.of Ohio (2000), 89 Ohio St.3d 431, 435; "Waiver assumes one has an opportunity to choose between either relinquishing or enforcing of the right." Chubb v. Ohio Bur. of Workers' Comp. (1998), 81 Ohio St.3d 275,279. A party who has a duty to perform and who changes its position as a result of the waiver may enforce the waiver. Id. at 279, citingAndrews v. State Teachers Retirement Sys. (1980), 62 Ohio St.2d 202,205. The party asserting waiver must prove the waiving party's clear, unequivocal, decisive act. Automated Solutions Corp. v. Paragon DataSystem, 167 Ohio App.3d 685, 2006-Ohio-3492, at ¶ 28.
 {¶ 45} "`Laches is an omission to assert a right for an unreasonable and unexplained length of time, under circumstances prejudicial to the adverse party.'" Connin v. Bailey (1984), 15 Ohio St.3d 34, 35, quotingSmith v. Smith (1957), 107 Ohio App. 440, 443-444, affirmed (1959),168 Ohio St. 447. The elements of laches are (1) an unreasonable delay or lapse of time in asserting a right, (2) the absence of an excuse for the delay, (3) knowledge, actual or constructive, of the injury or wrong, and (4) prejudice *Page 18 
to the other party. State ex rel. Ohio Dept. of Mental Health v.Nadel, 98 Ohio St.3d 405, 2003-Ohio-1632, at ¶ 16.
 {¶ 46} PCA premises its waiver and laches arguments on Atelier's failure to factually rebut Chavez' affidavit. PCA specifically relies on Chavez' statements that Atelier assumed full responsibility for securing the DDC's approval for the lot improvements after the DDC tabled its decision on the matter. Chavez stated that Atelier's subsequent silence on the matter led him to "believe" Atelier abandoned the improvements and waived PCA's duty to perform them. (Sept. 7, 2005 Affidavit of Chavez, ¶ 3, 5 10.)
 {¶ 47} At best, the statements are equivocal as to PCA's duty to perform the improvements on Lots 43 and 44. Neither equivocal nor inconsistent conduct constitutes a waiver. Bucher, at ¶ 15. Nor does silence constitute a waiver where, as here, one is not obligated to speak. Id. Chavez' statements do not establish a genuine issue of material fact to support PCA's waiver defense.
 {¶ 48} Moreover, because the Addendum does not contain a "time is of the essence" provision or a due date for performing contractual obligations, Atelier could demand PCA's performance any time during the Addendum's term and could reasonably expect PCA would perform its obligations at any time during the duration of the Addendum. Indeed, Chavez' affidavit states Atelier demanded PCA's performance on April 27, 2004, during the Addendum's term. Thus, Atelier did not "waive" its right to enforce its rights under the contracts, and its delay in asserting its contractual rights was not unreasonable, especially where the DDC gave its approval less than three months before Atelier requested PCA to fulfill its contractual obligations. *Page 19 
 {¶ 49} Because the trial court did not err in granting summary judgment against PCA's defenses of waiver and laches, PCA's third assignment of error is overruled.
VI. Breach of Right of First Refusal {¶ 50} PCA's fifth assignment of error asserts the trial court erred in denying its counterclaim that alleged Atelier breached PCA's contractual "right of first refusal" by "leasing or renting to another prospective tenant" after the Lease expired. (Emphasis added; Addendum, § 2.)
 {¶ 51} PCA premises its claim on Atelier's entering into an agreement with Ampco System Parking after the Lease and Addendum with PCA expired. Under the agreement, Ampco was to operate the subject parking lots and to perform substantially the same tasks that PCA performed under the Lease and Addendum. The trial court concluded Atelier did not breach PCA's contractual right of first refusal because (1) PCA's breach of the Addendum relieved Atelier of its obligation to provide PCA with a right of first refusal, and (2) even if PCA did not breach the Addendum, PCA's right of first refusal was never triggered because Atelier entered into a "management agreement" with Ampco.
 {¶ 52} At trial, Atelier presented evidence that its management agreement with Ampco differs from PCA's Lease. Under the Lease, PCA was a lessee to whom Atelier conveyed a leasehold interest, PCA had the right to occupy and control the premises, and PCA paid rent to Atelier. PCA conducted the parking operations on its own behalf, assumed the risks, and enjoyed the benefits associated with operating a parking lot on the premises. See Jones v. Keck (1946), 79 Ohio App. 549, 552
(defining "lease" as "a conveyance of an estate in real property for a limited term, with conditions attached, in consideration of rent"). By contrast, Atelier's management agreement with Ampco *Page 20 
conveys no property interest. Under it, Atelier pays Ampco a monthly fee to manage the parking lot operations on behalf of Atelier as the owner; Atelier has control of the premises, assumes the risks, and enjoys the benefits associated with the parking operations. Unlike a lease, the management agreement is tantamount to a "license." See id. (stating a "license in respect to real estate is authority granted by the owner to another to do a particular act or series of acts upon the land without grant to the licensee or any estate or interest in the land").
 {¶ 53} Competent, credible evidence thus supports the trial court's determination that Atelier's management agreement with Ampco is not a lease or rental agreement so that PCA's "right of first refusal" not only was not breached but was never triggered. PCA's fifth assignment of error is overruled.
VII. Demolition Work {¶ 54} In its fourth assignment of error, PCA asserts the trial court erred in awarding Atelier the demolition costs for the two buildings on Lots 43 and 44. PCA contends Atelier was obligated under Section 10 of the Lease to pay for any improvements governmental authorities ordered.
 {¶ 55} Section 10 addresses repair and provides generally that the "Lessee shall keep the Premises in good order and shall maintain the Premises in the same condition as Premises are at the time of occupancy." The section further provides that "[a]ny structural, mechanical, electrical, or other installations or improvements to the Premises required by statutes or regulation * * *, or any other governmental requirements, shall be the sole responsibility of Lessor." The "Improvements" provision, however, obligates PCA, as the Lessee, to "make improvements to * * * [the] Parking Lots which shall include * * * *Page 21 
demolition * * * described in Exhibit B." The parties agree that Exhibit B, in turn, required demolition of the two structures that were on Lots 43 and 44 when the parties executed the Lease and Addendum.
 {¶ 56} The trial court did not reference Section 10 of the Lease, but it determined Atelier caused the buildings to be demolished "in order to avoid sanctions and comply with the Order from the City of Columbus." (Decision, ¶ 50.) Ultimately concluding PCA was obligated to undertake the demolition under the "Improvements" provision, the court ordered PCA to pay $27,000 to Atelier as the cost for the demolition work. Our inquiry focuses on whether Section 10 of the Lease or the "Improvements" provision is controlling. We conduct a de novo review of the pertinent provisions and construe them to give effect to the parties' intent.Saunders, supra.
 {¶ 57} Generally, absent an express agreement to the contrary, a lessor is responsible for making or paying for substantial or structural improvements to commercial premises where a governmental agency orders the changes that go beyond what may be considered ordinary repairs.Wollett v. Boston Bars, Inc. (June 26, 1980), Franklin App. No. 79AP-644. See, also, Fritz v. Otis Elevator Co. (1988),48 Ohio App.3d 240 (distinguishing "ordinary repairs" from substantial "improvements to real property"). Pursuant to Section 10 of the Lease, Atelier, as the lessor, assumed the "sole responsibility" for demolition of the two buildings on Lots 43 and 44 when it undertook the demolition work pursuant to the city of Columbus' emergency order. PCA's agreement in the "Improvements" provision to demolish the buildings on Lots 43 and 44 does not specifically modify, supercede or relieve Atelier of the "sole responsibility" it assumed under Section 10 of the Lease to perform improvements the city ordered. Hence, Atelier *Page 22 
retained the "sole responsibility" to perform the demolition work the city ordered, including the responsibility to pay the costs of the demolition work.
 {¶ 58} Because Section 10 of the Lease controls demolition work done pursuant to the city's order, PCA's fourth assignment of error is sustained.
VIII. Damages {¶ 59} PCA's sixth assignment of error argues the damages the trial court awarded for PCA's failure to improve Lots 43 and 44 were unreasonably high and far different in scope than the parties agreed when they executed the Addendum. Maintaining the parties intended only that PCA install an "asphalt overlay" and provide minimal drainage, PCA contends the court, at most, should have awarded Atelier $131,000, the amount PCA's paving expert testified it would cost for the work on the subject lots.
 {¶ 60} "`Damages for a breach of contract are those which are the natural or probable consequence of the breach of contract or damages resulting from the breach that were within the contemplation of both parties at the time of the making of the contract.'" Wells, at ¶ 11, quoting The Toledo Group, Inc. v. Benton Industries, Inc. (1993),87 Ohio App.3d 798, 806. Contract damages are intended to place the injured party in the same position it would have been had the contract not been breached. Wells, supra, citing Schulke Radio Productions, Ltd. v.Midwestern Broadcasting Co. (1983), 6 Ohio St.3d 436, 439. Damages need not be calculated with mathematical certainty, but cannot be based on mere speculation and conjecture. Allied Erecting Dismantling Co., Inc.v. Youngstown, 151 Ohio App.3d 16, 2002-Ohio-5179, at ¶ 64. The plaintiff must show its entitlement to damages in an amount ascertainable with reasonable certainty. *Page 23 
Id.; Interstate Gas Supply, Inc. v. Calex Corp., Franklin App No. 04AP-980, 2006-Ohio-638, at ¶ 59.
 {¶ 61} At trial, Chavez acknowledged the scope of the paving and fencing improvements on Lots 43 and 44 would depend on the various governmental requirements PCA had to comply with in order to obtain the necessary approval and permits to do the work. The subject lots undisputedly are located in a designated historic redevelopment area that is subject to more governmental restrictions and requirements than a non-designated area. Because the parties agreed at trial that the stated dollar amounts in Exhibit B for the improvements reflect only "estimated" costs for the paving and fencing work not yet been performed, both parties presented evidence on projected costs to complete the paving and fencing improvements on Lots 43 and 44.
 {¶ 62} Glenn Halmbacher, a civil engineer licensed in Ohio and California with approximately 30 years of experience, and Drew DiMaccio, a local asphalt contractor with over 20 years of commercial paving experience, both testified on behalf of Atelier that a mere "asphalt overlay" on Lots 43 and 44 would not comport with the city of Columbus' requirements. Each witness was extensively familiar with city requirements for commercial paving and development work, including work performed in historic redevelopment areas.
 {¶ 63} Halmbacher presented unrebutted evidence on behalf of Atelier that the reasonable cost of engineering services for the improvements on Lots 43 and 44 was $29,000, including coordination between the various state agencies, ensuring compliance with applicable zoning codes and governmental regulations, and creating engineered drawings from which the paving and fencing work on Lots 43 and 44 could be done. With *Page 24 
respect to the construction work related to the paving and fencing improvements on Lots 43 and 44, Halmbacher testified the cost estimate for the work, after factoring in all the governmental requirements, was $419,316.51; Halmbacher's detailed written estimate was admitted into evidence. DiMaccio testified that approximately a year before trial he estimated the paving and fencing improvements, done in compliance with city requirements, would cost $311,842, a cost he opined would be higher at the time of trial.
 {¶ 64} James Kuhn, a local paving contractor with over 20 years of primarily residential paving and asphalt overlay experience, testified on behalf of PCA. He estimated a cost of $131,000 to complete the paving and fencing work on Lots 43 and 44. He, however, conceded his estimate did not include monies for fees, permits, or a hydrology plan, and he did not utilize engineered drawings or consult with an engineer, architect or any city of Columbus representative in preparing his estimate. He explained his estimate was lower than the others presented at trial because his estimate assumed installation of an asphalt overlay on the existing lot surface rather than excavation and reconstruction of the entire lot surface. He also acknowledged his estimate did not include sidewalks or handicap ramps included in the other estimates.
 {¶ 65} The trial court found that PCA, as a sophisticated business with experience owning and managing parking lots throughout the United States, reasonably foresaw or should have foreseen the cost for paving and fencing could deviate from the amounts estimated in the Addendum. Finding the evidence regarding the necessity and cost of engineering services to be unrebutted, the trial court awarded Atelier $29,000 in engineering costs. After weighing the conflicting evidence regarding the construction costs to complete the paving and fencing work on Lots 43 and 44, the court found *Page 25 
Atelier's witnesses more compelling because they had greater expertise in the commercial paving context. The trial court thus awarded Atelier $419,316 as the reasonably certain and foreseeable construction cost to complete the paving and fencing work on Lots 43 and 44.
 {¶ 66} Because the trial court, as the trier of fact, appropriately weighed the evidence regarding the paving and fencing costs on Lots 43 and 44, and competent, credible evidence supports its damages award for the paving and fencing improvements, PCA's sixth assignment of error is overruled.
VIII. Conclusion {¶ 67} Having sustained PCA's fourth assignment of error and overruled its remaining assignments of error, we modify the trial court's judgment to the extent it concluded PCA was contractually obligated to perform and pay for the costs of the demolition work that was performed pursuant to an order of the city of Columbus, we reduce the award to Atelier by the $27,000 the court awarded it for the demolition work, and we affirm the judgment as modified.
Judgment affirmed as modified.
KLATT and DESHLER, JJ., concur.
DESHLER, J., retired of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution. *Page 1