[Cite as *Grigoryan v. MaxOut Sports, L.L.C.*, 2017-Ohio-6982.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 105251**

## GHAZAROS GRIGORYAN

PLAINTIFF-APPELLEE

vs.

## MAXOUT SPORTS, L.L.C.

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CV-16-859746

**BEFORE:** Celebrezze, J., E.T. Gallagher, P.J., and Blackmon, J.

**RELEASED AND JOURNALIZED:** July 27, 2017

**ATTORNEY FOR APPELLANT**

Kenneth L. Gibson
Gibson & Moran, L.L.C.
234 Portage Trail
P.O. Box 535
Cuyahoga Falls, Ohio 44221


**ATTORNEYS FOR APPELLEE**

Samuel J. Lauricia, III
Matthew Miller
Timothy R. Obringer
Scott J. Orille
Weston Hurd, L.L.P.
Tower at Erieview
1301 East 9th Street, Suite 1900
Cleveland, Ohio 44114

FRANK D. CELEBREZZE, JR., J.:

**{¶1}** Defendant-appellant, MaxOut Sports, L.L.C. ("MaxOut"), brings this appeal challenging the trial court's order granting summary judgment in favor of plaintiff-appellee, Ghazaros Grigoryan ("appellee"), on appellee's claim for declaratory judgment. Specifically, MaxOut argues that the trial court erred by determining that a valid and enforceable contract existed permitting appellee to compete against MaxOut and by denying its motion for a preliminary injunction. After a thorough review of the record and law, this court affirms.

## I. Factual and Procedural History

**{¶2}** The instant matter arose from a dispute between appellee and MaxOut regarding the noncompete provision in MaxOut's operating agreement. MaxOut is a martial arts training and fitness center in Bedford Heights, Ohio. Appellee was a former manager and director of training with MaxOut.

**{¶3}** MaxOut's managers executed an operating agreement in December 2012. The operating agreement identified the company's members, managers, and officers, set forth the members' ownership of the company, and set forth various policies pertaining to the company's operation. The operating agreement also contained a noncompete provision that, among other things, prohibited any manager from conducting the same or similar business activities within a 50-mile radius of MaxOut.

{¶4} The operating agreement identified the following four managers and provided that these managers were responsible for managing the company: (1) Shane Hudson ("Hudson"), (2) Corneliu Mihalca ("Mihalca"), (3) Alexander Bagne ("Bagne"), and (4) appellee. In or around January 2016, appellee expressed an interest in withdrawing from MaxOut and opening his own martial arts training facility.

{¶5} On January 19, 2016, appellee and Hudson executed a withdrawal agreement. [1] Pursuant to the withdrawal agreement, appellee would surrender his ownership share in the company to Hudson in exchange for being relieved from the noncompete provision's prohibition against conducting the same or similar business activities within a 50-mile radius of MaxOut.

{¶6} After entering into the withdrawal agreement, appellee opened a martial arts training facility in Mayfield Village, Ohio, on January 30, 2016. On February 5, 2016, an attorney acting on behalf of MaxOut sent a cease and desist letter to appellee, asserting that he was still subject to the operating agreement's noncompete provision.

{¶7} On March 2, 2016, appellee filed a complaint for declaratory judgment pursuant to R.C. 2721.03. In his complaint, appellee requested a declaratory judgment that he was, in fact, entitled to operate his own martial arts training facility pursuant to the withdrawal agreement. Appellee attached the operating agreement, the withdrawal agreement, and the letter from MaxOut's counsel to his complaint. On March 29, 2016,

---

[1] It is unclear whether the withdrawal agreement was drafted by appellee, Hudson, or another representative of MaxOut.

MaxOut filed an answer and asserted a counterclaim against appellee for breach of the noncompete provision.

{¶8} MaxOut filed a motion for summary judgment and a preliminary injunction on August 31, 2016. Appellee filed a motion for summary judgment on September 1, 2016.

{¶9} On November 7, 2016, the trial court granted appellee's motion for summary judgment in part and denied the motion in part. The trial court granted summary judgment in appellee's favor on his claim for declaratory relief, concluding that the withdrawal agreement was a valid contract that permitted appellee to compete against MaxOut. The court denied appellee's motion for summary judgment on MaxOut's counterclaim for breach of the noncompete provision. Furthermore, the trial court denied MaxOut's motion for summary judgment and preliminary injunction.

{¶10} On December 8, 2016, the parties filed an agreed order in which MaxOut agreed to dismiss its counterclaim for breach of the noncompete provision without prejudice, rendering the trial court's November 7, 2016 judgment a final appealable order. The trial court approved the parties' agreed order.

{¶11} On December 13, 2016, MaxOut filed the instant appeal challenging the trial court's judgment. MaxOut assigns two errors for review:

> I. The trial court erred in granting [s]ummary [j]udgment to [appellee] and denying summary judgment to Max[O]ut on the issue of the validity of the withdrawal agreement.

> II. The trial court erred in failing to grant injunctive relief.

## II. Law and Analysis

### A. Summary Judgment

{¶12} This court reviews an appeal from summary judgment under a de novo standard of review. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). We accord no deference to the trial court's decision and independently review the record to determine whether summary judgment is appropriate.

{¶13} Pursuant to Civ.R. 56, summary judgment is appropriate when (1) no genuine issue as to any material fact exists, (2) the party moving for summary judgment is entitled to judgment as a matter of law, and (3) viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can reach only one conclusion that is adverse to the nonmoving party.

{¶14} On a motion for summary judgment, the moving party carries an initial burden of identifying specific facts in the record that demonstrate his or her entitlement to summary judgment. *Dresher v. Burt*, 75 Ohio St.3d 280, 292-293, 662 N.E.2d 264 (1996). If the moving party fails to meet this burden, summary judgment is not appropriate. However, if the moving party meets this burden, the nonmoving party has the reciprocal burden to point to evidence of specific facts in the record demonstrating the existence of a genuine issue of material fact for trial. *Id*. at 293. Summary judgment is appropriate if the nonmoving party fails to meet this burden. *Id*.

### B. Interpretation of the Operating Agreement

{¶15} The withdrawal agreement provides:

[appellee] expressed interest in purchasing a competing business to [MaxOut], and as such, agreed to withdrawal as a member, manager, and officer of [MaxOut].  As part of this withdrawal, [appellee] agreed to relinquish his share in [MaxOut] to Shane Hudson.

In exchange for [appellee's] withdrawal, [MaxOut] agrees not to enforce the specific term prohibiting managers from engaging in "any enterprise conducting business activities that are the same as or similar to MaxOut Sports within a 50-mile radius of [MaxOut]" per the non-compete provisions in the [operating agreement].  All other provisions in the non-compete provision, including a prohibition from "directly or indirectly solicit[ing] business from customers, clients, and prospective clients of [MaxOut]" as well as the prohibition from "directly or indirectly solicit[ing] any employee or independent contractor of [MaxOut] for employment elsewhere" shall remain in full effect.

The withdrawal agreement proposed to relieve appellee from the prohibition in the operating agreement's noncompete provision against conducting the same or similar business activities within a 50-mile radius of MaxOut.  Accordingly, the withdrawal agreement was, in effect, an amendment of the operating agreement.

**{¶16}** In order to determine whether the withdrawal agreement is valid and enforceable, we must determine whether appellee and Hudson had authority to amend the operating agreement's noncompete provision.   In order to make this determination, it is necessary to review the terms and provisions set forth in the operating agreement.

**{¶17}** As noted above, the operating agreement provides that MaxOut will be managed by four managers — Hudson, Mihalca, Bagne, and appellee.   The operating agreement sets forth each manager's ownership of the company: Hudson, 30%; Mihalca, 30%; Bagne, 5%, and appellee, 30%.[2]

---

[2] The remaining 5% is owned by Dan Pazara who is not listed as a manager.

**{¶18}** The operating agreement's voting provision provides, in relevant part:

Managers shall be entitled to vote based upon the following:

One (1) vote for each 10% ownership of stock; one half (0.5) vote for each 5% ownership of stock.

Regular matters that require a vote of the managers shall be approved by a majority vote.

A majority vote of the managers is required in order to authorize the following acts:

* * *

-amendment of the Operating Agreement

* * *

Action may be taken without a meeting if a majority vote of the managers consent to the action in writing.

Accordingly, there were a total of nine and one-half manager votes — Hudson, Mihalca, and appellee each had three votes, and Bagne had one-half vote.

**{¶19}** The operating agreement's noncompete provision provides, in relevant part:

[u]nless a majority approval is provided by all managers, no manager, for any reason, shall directly or indirectly solicit business from customers, clients and prospective clients of MaxOut Sports. Nor shall any manager engage in (as employee, instructor, principal, shareholder, partner, consultant, or any other capacity) any enterprise conducting business activities that are the same as or similar to MaxOut Sports within a 50-mile radius of MaxOut Sports. Manager shall not directly or indirectly solicit any employee or independent contractor of MaxOut Sports for employment elsewhere.

The parties dispute the meaning of the language "[u]nless a majority approval is provided by all managers" and the approval that is required in order to amend the noncompete

provision by approving the withdrawal agreement. Appellee contends that this language refers to a majority vote as provided in the operating agreement's voting provision. On the other hand, MaxOut asserts that this language refers to the approval of a majority of the managers — three out of the four managers — rather than a majority vote.

{¶20} In his motion for summary judgment, appellee argued that his and Hudson's approval of the withdrawal agreement was sufficient because together, he and Hudson represented a majority of the managers' vote. Furthermore, appellee argued that he and Hudson were the only managers who were authorized to vote on and approve the withdrawal agreement. In support of his argument, appellee directed the trial court to MaxOut's Internal Revenue Service tax document for the 2015 calendar year.

{¶21} The tax document listed four MaxOut "partners" and indicated the partner's share of profit, loss, and capital: (1) Hudson, 60%; (2) Mihalca, 0%; (3) Bagne, 0%; and (4) appellee, 40%. Appellee's argument is based on an application of the operating agreement's voting and "profit allocation" provisions. The profit allocation provision provides, "[n]et income or net loss of the LLC will be allocated to the members in proportion to their ownership of the LLC." Accordingly, appellee argues that because Mihalca's and Bagne's share of the profit, loss, and capital was 0%, their ownership of the company was 0% and, thus, they were not entitled to vote on or approve the withdrawal agreement.

{¶22} On the other hand, MaxOut argued that the withdrawal agreement needed to be approved by a majority of the managers — three out of the four managers — rather

than a majority vote of the managers. After review, however, we find that the operating agreement is devoid of any language supporting MaxOut's position.

{¶23} The purpose of contract construction is to discover and effectuate the intent of the parties. *Saunders v. Mortensen*, 101 Ohio St.3d 86, 2004-Ohio-24, 801 N.E.2d 452, ¶ 9. The intent of the parties is presumed to reside in the language they chose to use in their agreement. *Kelly v. Med. Life Ins. Co.*, 31 Ohio St.3d 130, 132, 509 N.E.2d 411 (1987). Principles of contract interpretation preclude us from rewriting the contract by reading into its language or terms that the parties omitted. *DDR Rio Hondo, L.L.C. v. Sunglass Hut Trading, L.L.C.*, 8th Dist. Cuyahoga No. 98986, 2013-Ohio-1800, ¶ 23.

{¶24} In the instant matter, MaxOut essentially asks this court to rewrite the operating agreement by reading into it that the approval of three out of the four managers is required in order to modify the operating agreement and/or approve the withdrawal agreement. MaxOut's contention is expressly contradicted by the voting provision's language that "[a] majority vote of the managers is required in order to authorize * * * amendment of the operating agreement." The operating agreement does not draw a distinction between "voting" and "approving." In fact, the voting provision's language that "[r]egular matters that require a vote of the managers shall be approved by a majority vote" suggests that voting and approving are one and the same.

{¶25} After reviewing the record, we find that appellee and Hudson had the authority to approve the withdrawal agreement. The withdrawal agreement amended the operating agreement's noncompete provision. As noted above, the voting provision

specifically provides that a majority vote is required in order to authorize an amendment of the operating agreement. It is undisputed that appellee and Hudson represented a majority of the managers' vote. Accordingly, the trial court properly declined to adopt MaxOut's interpretation that the approval of three out of the four managers was required, rather than a majority vote, in order to approve the withdrawal agreement.

{¶26} Regarding the 2015 tax document, MaxOut argued that a manager's ownership was governed by the operating agreement, not the tax document, and that the operating agreement cannot be amended by any tax documentation. MaxOut is essentially asking this court to apply the operating agreement's "members" provision, which sets forth the managers' ownership of the company, but not apply the operating agreement's profit allocation provision. MaxOut cannot have it both ways. Although the operating agreement may not have been formally amended to show a change in the managers' ownership interest in the company, an examination of the operating agreement's members and profit allocation provisions and the 2015 tax document clearly reflect that there had, in fact, been a change in the managers' ownership of the company between the execution of the operating agreement in December 2012, and the execution of the withdrawal agreement in January 2016.

{¶27} For all of the foregoing reasons, we find no merit to MaxOut's assertion that the withdrawal agreement needed to be approved by a majority of the managers rather than a majority vote of the managers.

### C. Condition Precedent

**{¶28}** In its motion for summary judgment, MaxOut further argued that Hudson's approval of the withdrawal agreement was conditioned upon Mihalca's approval of the agreement, and this condition was not satisfied.

> Under basic contract law, "[a] condition is an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due." Restatement of the Law 2d, Contracts, Section 224 (1981). A condition precedent is an event that must take place before a duty to perform arises. *Atelier Dist. v. Parking Co. of Am., Inc.*, 10th Dist. Franklin No. 07AP-87, 2007-Ohio-7138, ¶ 35. "Whether a provision in a contract is a condition precedent is a question of the parties' intent. Intent is ascertained by considering not only the language of a particular provision, but also the language of the entire agreement and its subject matter." *Troha v. Troha*, 105 Ohio App.3d 327, 334, 663 N.E.2d 1319 (2d Dist.1995). Conditions precedent are not favored under contract law and will not be found *unless the agreement plainly shows an intent to the contrary*. *Campbell v. George J. Igel & Co.*, [2013-Ohio-3584, 3 N.E.3d 219, ¶ 13 (4th Dist.)].

(Emphasis added.) *Westlake v. VWS, Inc.*, 8th Dist. Cuyahoga No. 100180, 2014-Ohio-1833, ¶ 24.

**{¶29}** In the instant matter, we cannot say that the withdrawal agreement plainly shows that the parties intended to create a condition precedent. The terms of the withdrawal agreement are clear and unambiguous. The express terms of the agreement require that appellee withdraw as a member, officer, and manager of MaxOut, relinquish his ownership shares to Hudson, and comply with the noncompete provision's prohibitions against soliciting business from MaxOut and MaxOut's employees. Furthermore, the express terms of the agreement require that MaxOut relieve appellee from the noncompete provision's prohibition against conducting the same or similar business activities within a 50-mile radius of MaxOut.

**{¶30}** The withdrawal agreement's language does not modify the parties' obligations and there is no language that evidences an intent to make these obligations conditional. The withdrawal agreement lacks language or words that are typically found in a conditional contract, including, but not limited to, "condition," "conditional," "contingent," "subject to," or "unless." *See Campbell* at ¶ 21. The agreement's language does not indicate that Hudson's approval is conditional in any way, and makes no reference to Mihalca's approval of the agreement. Had the parties intended to make Hudson's approval conditioned upon Mihalca's approval, they easily could have inserted language to that effect.

**{¶31}** In support of its argument that Mihalca's approval of the withdrawal agreement was a condition precedent, MaxOut attached affidavits of Hudson and Mihalca to its motion for summary judgment. First, Hudson averred, in relevant part,

> I had grave doubts about whether [the withdrawal] agreement would be fair to the other members and I told [appellee] that I would only approve this agreement if it were approved also by [Mihalca] who was another primary member/manager and who had loaned large sums of money to the company in order to provide the initial financing. I signed the withdrawal agreement, but did not deliver the signed copy to [appellee], but rather gave it to [Mihalca] for his consideration. I told [Mihalca] that if he approved of the withdrawal agreement, then he could send it with my approval to [appellee]. Ultimately neither [Mihalca] nor any of the other members or managers approved the withdrawal agreement and to my knowledge the partially executed withdrawal agreement was never delivered to [appellee].

**{¶32}** Second, Mihalca averred, in relevant part,

> I received a copy of the proposed withdrawal agreement from [Hudson] which he had signed but not delivered to [appellee] and was told that if I approved the agreement I could send it with his and my signature to [appellee].

After due consideration, I determined that there was nothing of benefit to [MaxOut] in the withdrawal agreement. I therefore did not approve the withdrawal agreement and did not forward the copy of the agreement with [Hudson's] signature to [appellee].

**{¶33}** It is undisputed that these affidavits are parol evidence. The parol evidence rule prohibits a party to a contract from introducing evidence of alleged or actual agreements that contradict the unambiguous terms of a written contract. *Grimmer v. Shirilla*, 8th Dist. Cuyahoga No. 103921, 2016-Ohio-5423, ¶ 20, citing *Ed Schory & Sons, Inc. v. Francis*, 75 Ohio St.3d 433, 440, 662 N.E.2d 1074 (1996). However, Ohio courts have held that parol evidence is admissible to establish a condition precedent to the existence of a contract.

**{¶34}** MaxOut directs this court to *Carter v. New Buckeye Redevelopment Corp.*, 8th Dist. Cuyahoga No. 72501, 1998 Ohio App. LEXIS 1414 (Apr. 2, 1998). There, this court held that even if a condition precedent is not included in the language of a contract, parol evidence is admissible to establish that the condition precedent was orally agreed upon. *Id*. at 7, citing *Riggs v. Std. Slag Co.*, 9th Dist. Summit No. 16199, 1993 Ohio App. LEXIS 5431 (Nov. 10, 1993), and *Frankel Chevrolet Co. v. Snyder*, 37 Ohio App. 378, 174 N.E. 751 (8th Dist.1930). This court explained, "[t]he parol evidence establishing a condition precedent does not contradict the terms of the document, but establishes a separate agreement that the document would only go into effect if certain contingencies occurred." *Carter* at 7-8.

[E]ven a condition precedent may not be shown by parol evidence when the condition is inconsistent with the express terms of the writing. When the

subject matter of a condition precedent is dealt with in the written instrument, in any form, the condition may not be shown by parol evidence to be different from the manner in which it is expressed in the writing.

*Villa Realty Co., Inc. v. Allied Invest. Credit Co.*, 8th Dist. Cuyahoga No. 35585, 1977 Ohio App. LEXIS 9337 (July 14, 1977). *Accord Campbell*, 2013-Ohio-3584, 3 N.E.3d 219, at ¶ 24; *Hiatt v. Giles*, 2d Dist. Darke No. 1662, 2005-Ohio-6536, ¶ 32.

**{¶35}** In the instant matter, as noted above, the withdrawal agreement unambiguously imposes a contractual duty on appellee and MaxOut to perform. Specifically, the withdrawal agreement provides, "[i]n exchange for [appellee's] withdrawal, [MaxOut] agrees not to enforce the specific term prohibiting managers from engaging in 'any enterprise conducting business activities that are the same as or similar to [MaxOut] within a 50-mile radius of [MaxOut.]'" Because the withdrawal agreement specifically addresses MaxOut's duties and obligations, any parol evidence, such as Hudson's and Mihalca's affidavits, offered to prove a contingent or conditional relationship contradict the express terms of the agreement. Accordingly, it would be inappropriate to rely on these affidavits. *See Campbell* at ¶ 24.

**{¶36}** We further note that Hudson's and Mihalca's affidavits are the only parol evidence in the record regarding the alleged condition precedent. Because MaxOut sought injunctive relief prohibiting appellee from conducting his competing business, these affidavits are undoubtedly self-serving.

**{¶37}** The nonmoving party cannot avoid summary judgment "by merely submitting a self-serving affidavit that simply contradicts the evidence offered by the

moving party." *FIA Card Servs., N.A. v. Pfundstein*, 8th Dist. Cuyahoga No. 101808, 2015-Ohio-2514, ¶ 11. "Permitting a nonmoving party to avoid summary judgment by asserting nothing more than 'bald contradictions of the evidence offered by the moving party' would render the summary judgment exercise meaningless." *Id*., quoting *Greaney v. Ohio Turnpike Comm.*, 11th Dist. Portage No. 2005-P-0012, 2005-Ohio-5284, ¶ 16.

{¶38} For all of the foregoing reasons, we find no merit to MaxOut's contention that Mihalca's approval was a condition precedent. Aside from the self-serving assertions in Hudson's and Mihalca's affidavits, there is no evidence in the record that Mihalca's approval was a condition precedent to appellee's or MaxOut's duties to perform under the withdrawal agreement. Furthermore, as noted above, Mihalca's approval was not necessary in order to approve the withdrawal agreement because the agreement was approved by Hudson and appellee who, together, represented a majority vote.

### D. Delivery

{¶39} MaxOut argues that the withdrawal agreement was not valid because the agreement was never signed and delivered back to appellee. MaxOut further asserts that the signed withdrawal agreement was "never delivered to [appellee] as an executed document." Appellant's reply brief at 1.

{¶40} Appellee attached a copy of the withdrawal agreement to his complaint. This copy did not contain any signatures. In support of his motion for summary judgment, appellee attached another copy of the withdrawal agreement. This copy

contained the signatures of appellee and Hudson. In its reply brief, however, MaxOut contends that the copy of the signed withdrawal agreement was only provided to appellee during the exchange of discovery.

{¶41} In its appellate brief, MaxOut asserts that appellee signed the withdrawal agreement and that Hudson "conditionally signed" the withdrawal agreement, but did not deliver the "conditionally signed" agreement to appellee. Appellant's brief at 3. Furthermore, MaxOut maintains that the withdrawal agreement was partially and conditionally executed. Appellant's brief at 4.

{¶42} As noted above, we find no merit to MaxOut's contention that Hudson conditionally approved the withdrawal agreement and that Mihalca's approval was a condition precedent. Furthermore, MaxOut's contention that the withdrawal agreement was partially approved or executed is belied by the record.

{¶43} The withdrawal agreement cannot be partially executed if it was signed by Hudson, alone, or by Hudson and appellee. As noted above, the 2015 tax document reflects that Hudson's share of the company's profit, loss, and capital was 60%, and appellee's share of the company's profit, loss, and capital was 40%. Accordingly, there were a total of ten manager votes — Hudson had six and appellee had four. Hudson alone represented a majority vote. Hudson and appellee were the only managers with voting authority when the withdrawal agreement was executed in January 2016.

{¶44} The affidavits of both Hudson and Mihalca acknowledge that Hudson did, in fact, sign the withdrawal agreement. Hudson's affidavit provides, in relevant part, "I

signed the Withdrawal Agreement, but did not deliver the signed copy to [appellee], but rather gave it to [Mihalca] for his consideration." Mihalca's affidavit provides, in relevant part, "I received a copy of the proposed Withdrawal Agreement from [Hudson] which he had signed but not delivered to appellee[.]"

{¶45} In *Estate of Brewer v. Dowell & Jones*, *Inc.*, 8th Dist. Cuyahoga No. 80563, 2002-Ohio-3440, this court explained, "physical delivery of a contract is not essential to create a legally enforceable agreement. *Indus*[.] *Heat Treating Co. v.* [*Toledo Stamping and Mfg. Co.*], 104 Ohio App.3d 499, 662 N.E.2d 837 [(6th Dist.1995)]. Where the parties intend to be bound by the contract, it is valid[.]" *Id*. at ¶ 11. *Accord Melia v. OfficeMax N. Am., Inc.*, 8th Dist. Cuyahoga No. 87249, 2006-Ohio-4765, ¶ 21.

{¶46} MaxOut does not dispute that Hudson signed the withdrawal agreement. Rather, MaxOut argues that (1) Hudson's approval was conditioned upon Mihalca's approval and (2) the withdrawal agreement was only partially executed because it was not signed or approved by Mihalca.

{¶47} The fact that Mihalca and Bagne did not approve or sign the withdrawal agreement has no effect on the agreement's validity. In fact, the 2015 tax document reflects that they had no share of the company's profit, loss, and capital, and thus, no voting authority.

{¶48} For all of these reasons, we find no merit to MaxOut's contention that the withdrawal agreement was not valid and enforceable because a signed copy was not physically delivered to appellee.

## E. R.C. 1705.31

**{¶49}** MaxOut argues that the trial court erred by failing to apply R.C. 1705.31 in determining whether the withdrawal agreement was valid and enforceable.

**{¶50}** R.C. 1705.31(A), governing contracts in which a manager of a limited liability company has a financial or personal interest, provides,

> Unless otherwise provided in the operating agreement, the following apply:
>
> (1) No contract, action, or transaction is void or voidable with respect to a limited liability company because it is between or affects the company and one or more of its members, managers, or officers, or because it is between or affects the company and any other person in which one or more of its members, managers, or officers are members, managers, directors, trustees, or officers or have a financial or personal interest, or because one or more interested members, managers, or officers participate in or vote at the meeting that authorizes the contract, action, or transaction, if any of the following applies:
>
> (a) The material facts as to his or their relationship or interest and as to the contract, action, or transaction are disclosed or are known to the members or managers, and the members or managers, in good faith reasonably justified by those facts, authorize the contract, action, or transaction by the affirmative vote of a majority of the disinterested members or managers, even though the disinterested members or managers constitute less than a quorum of the members or managers.
>
> (b) The material facts as to his or their relationship or interest and as to the contract, action, or transaction are disclosed or are known to the members entitled to vote on the contract, action, or transaction, and the contract, action, or transaction is specifically approved at a meeting of the members held for that purpose by the affirmative vote of the members entitled to exercise a majority of the voting power of the company held by persons not interested in the contract, action, or transaction.
>
> (c) The contract, action, or transaction is fair to the company as of the time it is authorized or approved by the members or managers.

**{¶51}** MaxOut argues that none of the three scenarios set forth in R.C. 1705.31(A)(1)(a), (b), and (c) apply. First, MaxOut asserts that there was not full disclosure of all the material facts because appellee failed to disclose that he had already solicited business from MaxOut customers and clients by informing them that he was leaving the company and opening up his own training facility. Second, MaxOut contends that Hudson and appellee were not disinterested parties to the contract because appellee was relieved from the noncompete provision and Hudson received appellee's interest in the company. Third, MaxOut argues that the withdrawal agreement was not fair to the company because only Hudson benefitted from the agreement by receiving appellee's ownership and the company received no benefit from the agreement.

**{¶52}** MaxOut emphasizes that "the withdrawal agreement was not approved by a majority vote of disinterested members[.]" Appellant's brief at 9. Initially, we note that the operating agreement provides that the company's *managers* are entitled to vote based on their ownership of stock in the company. The operating agreement does not provide for voting by *members*. Furthermore, this argument — that the withdrawal agreement had to be approved by a majority vote of the disinterested members — conflicts with MaxOut's assertion that the withdrawal agreement had to be approved by three out of the four managers.

**{¶53}** Nevertheless, MaxOut's reliance on R.C. 1705.31 is misplaced. It is undisputed that both Hudson and appellee were financially or personally interested in the withdrawal agreement. Pursuant to the withdrawal agreement, appellee would be

relieved from the noncompete provision's prohibition against conducting the same or similar business activities within a 50-mile radius of MaxOut, and Hudson received appellee's ownership in the company.

**{¶54}** The only disinterested managers were Mihalca and Bagne. However, as noted above, MaxOut's 2015 tax document reflects that both Mihalca's and Bagne's share of the profit, loss, and capital was 0%. Because the operating agreement provides that net income or net loss of the company is allocated in proportion to the members' ownership of the company, the only logical conclusion is that Mihalca's and Bagne's ownership of MaxOut was 0%. Without any ownership of stock in the company, neither Mihalca nor Bagne was entitled to vote on the withdrawal agreement.

**{¶55}** Accordingly, although Hudson and appellee both had an interest in the withdrawal agreement, the record reflects that they were the only managers who shared the company's profit, loss, and capital, and thus, were the only managers who were entitled to vote on or approve the withdrawal agreement. Therefore, the trial court did not err by failing to apply R.C. 1705.31.

**{¶56}** For all of the foregoing reasons, we find that the trial court properly granted summary judgment in appellee's favor and concluded that the withdrawal agreement was a valid contract. First, the withdrawal agreement was approved by appellee and Hudson who, together, represented a majority of the managers' vote. Second, Mihalca's approval was not a condition precedent to the parties' duties to perform under the withdrawal

agreement. Third, R.C. 1705.31 is inapplicable. Accordingly, MaxOut's first assignment of error is overruled.

## F. Injunctive Relief

{¶57} In its second assignment of error, MaxOut argues that the trial court erred by failing to grant injunctive relief. MaxOut concedes, however, that the trial court's determination that the withdrawal agreement modified the noncompete provision rendered its motion for preliminary injunction moot.

{¶58} In light of our determination that the withdrawal agreement is a valid and enforceable contract, and that the trial court properly granted summary judgment in appellee's favor, MaxOut's second assignment of error pertaining to its motion for a preliminary injunction is moot.

## III. Conclusion

{¶59} After thoroughly reviewing the record, we find that the trial court properly granted summary judgment in favor of appellee on his declaratory judgment claim. The withdrawal agreement was a valid and enforceable contract that relieved appellee from the noncompete provision's prohibition against conducting the same or similar business activities within a 50-mile radius of MaxOut.

{¶60} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

FRANK D. CELEBREZZE, JR., JUDGE

EILEEN T. GALLAGHER, P.J., and
PATRICIA ANN BLACKMON, J., CONCUR