[Cite as *Ross Sinclaire & Assoc., L.L.C. v. Huntington Natl. Bank*, 2018-Ohio-661.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

Ross Sinclaire and Associates, LLC,     :

      Plaintiff-Appellant,       :

                               No. 17AP-355

v.                                   :          (C.P.C. No. 15CV-2374)

The Huntington National Bank,         :           (REGULAR CALENDAR)

      Defendant-Appellee.       :

---

## D E C I S I O N

### Rendered on February 22, 2018

---

**On brief:** *Flagel & Papakirk, LLC, James Papakirk*, and *Hallie S. Borellis*, for appellant. **Argued:** *Hallie S. Borellis*.

**On brief:** *Porter, Wright, Morris & Arthur LLP, Kathleen M. Trafford, Robert W. Trafford*, and *Jay A. Yurkiw*, for appellee. **Argued:** *Kathleen M. Trafford*.

---

APPEAL from the Franklin County Court of Common Pleas

SADLER, J.

{¶ 1} Plaintiff-appellant, Ross Sinclaire and Associates, LLC ("RSA"), appeals from a judgment of the Franklin County Court of Common Pleas in favor of defendant-appellee, The Huntington National Bank ("HNB"). For the reasons that follow, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} RSA is a full-service investment banking, securities brokerage, and asset management firm with a principal office in Cincinnati, Ohio. HNB is a national banking association with its principal place of business located in Columbus, Ohio. The events that have resulted in this appeal began in 1998 when Montgomery County issued approximately $5.8 million in Multifamily Housing Mortgage Revenue Bonds. The

county allocated the proceeds from the sale of the bonds to a nonprofit corporation known as the Trinity Foundation, Inc. ("Trinity") to finance the redevelopment of the Squirrel Run Apartments ("Squirrel Run") in Trotwood, Ohio for low-income families. In conjunction with the receipt of the bond revenue, Trinity executed and delivered to HNB, as indenture trustee, a promissory note for each series of the bonds, secured by an Open-End First Mortgage, Assignment of Lease and Rents, and Security Agreement. (Ex. 3 attached to Joint Stipulation of Facts and Exs. (hereinafter "Joint Ex.").) The promissory notes obligated Trinity to fund the principal and interest payments due under the bonds out of the rental income derived from Squirrel Run. The existing 160-unit Squirrel Run apartment complex provided the collateral for the loan to Trinity. In 1998, the Squirrel Run property appraised at $5.5 million using an income approach.

{¶ 3} On November 8, 2001, HNB's trust administrator and senior vice president, Candada Moore ("Trustee Moore"), issued the first Notice to Holders of an Event of Default. The notice provides, in relevant part, as follows:

> As of the date of this notice, the Debt Service Reserve Fund * * * was used to make up the deficiencies in the payments for debt service due November 1, 2001 * * * and all holders of the Series A and Series B have been paid in full for such debt service that was due. To date, the Trinity Foundation, Inc. has not replenished the Debt Service Reserve Fund. Series C has not been paid for debt service due November 1, 2001.

(Joint Ex. 4 at 1.)

{¶ 4} Trustee Moore subsequently issued a similarly worded Notice to Holders of Continuing Events of Default on May 8, 2002, January 8, July 1, and November 20, 2003. Trustee Moore enclosed with the November 20, 2003 notice audited financial reports received on January 5, 2003. On December 10, 2003, Trinity and Montgomery County executed an agreement whereby Trinity agreed to make installment payments for delinquent property taxes.

{¶ 5} On February 26, 2004, Trustee Moore notified bondholders as follows:

> We are writing to you in our capacity as Trustee * * * to advise you that Trinity * * * as owner of the Project property which serves as collateral for and secures the Bonds, and as the obligor under the Loan Agreement which provides the revenues to pay the Bonds, has contacted Reilly Mortgage

> Group, Inc. ("Reilly") to apply for FHA mortgage insurance and to place a mortgage loan to retire the Bonds. * * * In order to proceed, Reilly requires an up front payment of $23,000 to pay for initial fees and expenses [and] has requested your consent to use $23,000 from the Debt Service Reserve Fund which secures the Bonds, to pay Reilly.

(Joint Ex. 10 at 1.)  The notice also advised bondholders that Trinity remained delinquent in its real property taxes and acknowledged that "ongoing routine repair and maintenance items, such as fixing storm drains and downspouts and replacing carpet, have regularly fallen behind as occupancy and revenues have not kept pace.  There are frequent roof repair needs, patio dividers and balcony floors and railings have deteriorated wood and fogged up patio doors have been an ongoing problem."  (Joint Ex. 10 at 2.)

{¶ 6}  On May 18, 2004, Trustee Moore issued another Notice to Holders of Continuing Events of Default.  On May 19, Reilly had the Squirrel Run property appraised in furtherance of its efforts to secure FHA refinancing.  The appraiser estimated the fair market value of the property, using a cost-basis approach, between $3.3 and $3.5 million.

{¶ 7}  On November 5, 2004, November 8, 2005, and May 5, 2006, Trustee Moore issued a Notice to Holders of Continuing Events of Default and Partial Interest payment.  The November 5, 2004 notice informed bondholders that Reilly was unable to secure refinancing because "it has not been able to obtain FHA mortgage insurance due to receipt of an appraisal that was lower than needed for a full refinancing."  (Joint Ex. 13 at 2.)  The notice indicated "[o]ther refinancing alternatives are being explored."  (Joint Ex. 13 at 2.)

{¶ 8}  In February  2006, RSA made its first purchase of the bonds at issue, by and through RSA employee Philip Lucas.  Lucas knew the loan to Trinity was in default status when he made the purchase.  Lucas and RSA also had access to all prior notices of default, but Lucas did not recall reviewing any of the notices to bondholders issued prior to the time he purchased the bonds in 2006.  In his deposition, Lucas maintained he was not concerned the loan was in default status because he believed the collateral securing the loan and the bonds had value.  Lucas testified that over several years he engaged in some direct communications with Trustee Moore regarding the status of the project and

the value of the collateral.  The parties disagree as to the precise nature and import of RSA's communications with Trustee Moore.

{¶ 9}  RSA did receive some scheduled interest payments associated with the Squirrel Run bonds purchased in 2006, but RSA received no such payments after December 2006.  Trustee Moore subsequently issued a Notice to Holders of Continuing Events of Default on December 17, 2006, May 8, and November 8, 2007.  A Squirrel Run "Balance Sheet" provided to all bondholders as an attachment to the December 27, 2006 notice shows "Total Assets" of $4,559,229.84 and "Total Liabilities" of $5,909,991.73 as of December 31, 2005.  (Joint Ex. 16.)

{¶ 10} In February 2007, RSA records show it made a profit of $4,487.55 when Lucas sold some of the Squirrel Run bonds it had purchased in 2006.  Lucas shared in these profits pursuant to a profit-sharing agreement with RSA.  The record also shows on January 1, 2009, RSA held Squirrel Run bonds purchased by Lucas with a total face value of $250,000.  From January 1 to March 24, 2009, Lucas purchased additional Squirrel Run bonds on behalf of RSA with a total face value of $530,000, for which it paid $58,415, approximately 11 cents on the dollar.

{¶ 11} On April 2, 2009, HNB, "as Trustee for the Multifamily Housing Mortgage Revenue Bonds," filed a "Complaint on Notes, Foreclosure, Sale of Collateral, Specific Performance of Assignment of Rents, Appointment of a Receiver, and for an Accounting and Inspection" against Trinity and several other defendants in the Montgomery County Court of Common Pleas.  (Joint Ex. 19 at 1, 2.)  On April 10, 2009, Trustee Moore issued a Notice of Default and Acceleration notifying bondholders of the action.

{¶ 12} RSA continued to buy Squirrel Run bonds after HNB filed the foreclosure action.  RSA bought Squirrel Run bonds with a total face value of $755,000 for $80,865, or 9.3 cents on the dollar.  The post-foreclosure purchases increased the total face value of RSA's holdings in Squirrel Run bonds to $1,535,000 for which it paid a total of $217,055, roughly 14 cents on the dollar on average.

{¶ 13} On August 31, 2009, HNB moved the Montgomery County Court of Common Pleas to appoint a receiver.  On that same date, the Montgomery County Court of Common Pleas appointed a receiver to "take charge of, preserve, [and] manage" Squirrel Run.  (Joint Ex. 21 at 1.)  On November 15, 2010, Trustee Moore issued a Notice

of Default and Receiver Sale. On August 8, 2011, Trustee Moore issued an Urgent Request for Immediate Direction to all bondholders, which requested bondholder approval of a proposed sale of the Squirrel Run property for $2.45 million, conditioned on the buyer obtaining tax credit financing to rehabilitate the property. The request also indicates "[t]o date the receiver has received a number of offers in the $1,600,000 range and attempted to negotiate them higher." (Joint Ex. 23 at 1.)

{¶ 14} On August 29, 2012, Squirrel Run sold for $1.6 million. After deducting outstanding expenses, taxes, and fees from the sale proceeds, RSA received a distribution out of the net proceeds of $164,043.05. HNB received a total of $134,462 for its services as indenture trustee from November 1998 through December 2012.

{¶ 15} On July 31, 2013, RSA filed a complaint against HNB in the Montgomery County Court of Common Pleas alleging breach of contract and breach of fiduciary duty. That complaint was dismissed without prejudice, and on September 24, 2014, RSA refiled the complaint against HNB in the Hamilton County Court of Common Pleas. On February 18, 2015, the Hamilton County Court of Common Pleas transferred venue of the case to Franklin County. On April 25, 2015, RSA moved the trial court to amend the complaint to add claims for negligence and breach of trust. The trial court granted the motion on May 19, 2015.

{¶ 16} On May 29, 2015, HNB moved the trial court to dismiss the complaint pursuant to Civ.R. 12(B)(6). The trial court dismissed RSA's claims for common-law negligence and breach of contract on November 20, 2015 for failure to state a claim on which relief may be granted. On August 19, 2016, HNB filed a motion for summary judgment as to the remaining claims for breach of fiduciary duty and breach of trust. HNB argued the four-year statute of limitations barred RSA's claims because as early as 2007, RSA knew or should have known of the alleged breach of trust. RSA argued its claims for breach of trust and breach of fiduciary duty did not accrue until 2012 when it received the distribution of proceeds from the sale of Squirrel Run. RSA argues, alternatively, there are genuine issues of fact as to what RSA knew and when, precluding summary judgment.

{¶ 17} The trial court found the only reasonable conclusion to be drawn from the evidence is that RSA's claims for breach of fiduciary duty and breach of trust accrued at

the latest in April 2009 when HNB filed the complaint in foreclosure and notified bondholders of the action. Accordingly, the trial court held the four-year statute of limitations barred RSA's claims against HNB because they did not file the complaint in Montgomery County until July 31, 2013. The trial court journalized a final judgment entry in favor of HNB on April 17, 2017.

{¶ 18} RSA timely appealed to this court from the judgment of the trial court.

## II. ASSIGNMENT OF ERROR

{¶ 19} RSA sets forth the following assignment of error:

> The trial court erred in granting summary judgment to Huntington National Bank [] on Ross Sinclaire and Associates, LLC's [] claims for breach of fiduciary duty and breach of trust when substantial questions of material fact exist and HNB is not entitled to judgment as a matter of law.

## III. STANDARD OF REVIEW

{¶ 20} Pursuant to Civ.R. 56(C), summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." "Accordingly, summary judgment is appropriate only under the following circumstances: (1) no genuine issue of material fact remains to be litigated, (2) the moving party is entitled to judgment as a matter of law, and (3) viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can come to but one conclusion, that conclusion being adverse to the nonmoving party." *Slane v. Hilliard*, 10th Dist. No. 15AP-493, 2016-Ohio-306, ¶ 12, citing *Byrd v. Arbors E. Subacute & Rehab. Ctr.*, 10th Dist. No. 14AP-232, 2014-Ohio-3935, ¶ 6, citing *Harless v. Willis Day Warehousing* Co, 54 Ohio St.2d 64, 66 (1978).

{¶ 21} " '[T]he moving party bears the initial responsibility of informing the trial court of the basis for the motion, and identifying those portions of the record before the trial court which demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim.' " *Byrd* at ¶ 7, quoting *Dresher v. Burt*, 75 Ohio St.3d 280, 292 (1996). Once the moving party meets its initial burden, the nonmovant must set forth specific facts demonstrating a genuine issue for trial. *Byrd* at ¶ 7, citing *Dresher* at

293. Because summary judgment is a procedural device to terminate litigation, courts should award it cautiously after resolving all doubts in favor of the nonmoving party. *Byrd* at ¶ 7, citing *Murphy v. Reynoldsburg*, 65 Ohio St.3d 356, 358-59 (1992).

{¶ 22} Appellate review of summary judgment is de novo. *Byrd* at ¶ 5. When an appellate court reviews a trial court's disposition of a summary judgment motion, it applies the same standard as the trial court and conducts an independent review, without deference to the trial court's determination. *Id.*, citing *Maust v. Bank One Columbus, N.A*, 83 Ohio App.3d 103, 107 (10th Dist.1992); *Brown v. Cty. Commrs.*, 87 Ohio App.3d 704, 711 (4th Dist.1993).

## IV. LEGAL ANALYSIS

{¶ 23} In appellant's sole assignment of error, appellant contends the trial court erred when it granted summary judgment in favor of HNB as to the claims for breach of fiduciary duty and breach of trust because there are genuine issues of fact whether the statute of limitations barred appellant's claims. We disagree.

{¶ 24} One asserting a claim of breach of fiduciary duty must establish the existence of a fiduciary duty, breach of that duty, and injury proximately caused by the breach. *Newcomer v. Natl. City Bank*, 6th Dist. No. WM-12-007, 2014-Ohio-3619, ¶ 9, *appeal dismissed*, 141 Ohio St.3d 1429, 2015-Ohio-12, citing *Strock v. Pressnell*, 38 Ohio St.3d 207, 216 (1988); *Sudnick v. Klein*, 11th Dist. No. 2001-G-2356, 2002-Ohio-7341, ¶ 25. Appellant's complaint alleges claims for breach of fiduciary duty under the common law and for breach of trust as defined in R.C. 5810.01 et seq. R.C. 2305.09(D) provides a four-year limitations period for a cause of action seeking recovery for "an injury to the rights of the plaintiff not arising on contract nor enumerated in sections 1304.35, 2305.10 to 2305.12, and 2305.14 of the Revised Code." This court has determined the four-year limitations period in R.C. 2305.09(D) applies to a common-law claim for breach of fiduciary duty. *Clemens v. Nelson Fin. Group, Inc.*, 10th Dist. No. 14AP-537, 2015-Ohio-1232, ¶ 46, citing *Wells v. C.J. Mahan Constr. Co.*, 10th Dist. No. 05AP-180, 2006-Ohio-1831, ¶ 26.

{¶ 25} Under the common law, a cause of action for breach of fiduciary duty which could be brought prior to the termination of a trust is barred by the statute of limitations if not timely filed. *Cundall v. U.S. Bank*, 122 Ohio St.3d 188, 2009-Ohio-2523, ¶ 29,

citing *Paschall v. Hinderer*, 28 Ohio St. 568, 576 (1876). When, however, a trustee's misconduct is surreptitious or obscured and remains so until the trustee's death or removal, a cause of action by trust beneficiaries against a trustee accrues and the statute of limitations begins to run when the fiduciary relationship ends. *Cundall* at ¶ 27, citing *State ex rel. Lien v. House*, 144 Ohio St. 238 (1944).

{¶ 26} In this instance, RSA's claims for breach of fiduciary duty and breach of trust are predicated on the same operative facts. The gravamen of the complaint is that Trustee Moore failed to timely file a foreclosure action which, according to RSA, would have preserved a greater portion of trust assets for distribution to the bondholders.[1] RSA alleges that HNB, by and through Trustee Moore, breached a duty it owed to RSA by failing to provide the bondholders with relevant information regarding the financial difficulties experienced by Trinity and the deteriorating condition of the Squirrel Run property and/or providing RSA with false and misleading information regarding the status of the project that prevented RSA from discovering the breach of trust.

{¶ 27} The parties agree the applicable statute of limitations is four years for RSA's claims. RSA filed its original complaint in Montgomery County on July 13, 2013. Consequently, the statute of limitations barred any of RSA's claims that accrued prior to July 13, 2009. RSA first contends its cause of action accrued in 2012 when HNB "ended its role as trustee by selling the trust *res* and distributing the proceeds to the trust beneficiaries." (Emphasis sic.) (Appellant's Brief at 2.) HNB argues RSA's claims accrued when RSA either knew or, in the exercise of reasonable diligence, should have learned of a breach of trust. We agree with HNB.

{¶ 28} In *Cundall*, a successor trustee, on behalf of certain trust beneficiaries, sued a former trustee for fraud, self-dealing, and breach of fiduciary duty. The First District Court of Appeals affirmed the judgment of the trial court that the cause of action did not

---

[1] The amended complaint provides, in relevant part, as follows: "Despite knowing, in 2004, that Trinity was not protecting the value of the asset underlying the bondholders' security, and knowing that an appraisal of Squirrel Run Apartments did not support refinancing, [HNB] did nothing to maximize bondholder return. Instead, [HNB] allowed Squirrel Run Apartments to fall into further disrepair and took no action to foreclose on Squirrel Run Apartments for another five years. [The trustee's] fiduciary failure is demonstrated drastically by its failure to take any decisive action to preserve the Trust asset. This delay ultimately caused the opportunity to be lost to the detriment of the Trust and the bondholders." (Am. Compl. at 11, 12.)

accrue, and the four-year statute of limitations did not begin to run until the death of the former trustee. The Supreme Court of Ohio, in applying the four-year statute of limitations in R.C. 2305.09, held the First District erred when it determined the cause for breach of fiduciary duty accrued on the death of the prior trustee because the beneficiaries knew much earlier, or reasonably should have known, the true value of trust assets sold had possibly been misrepresented. In so holding, the Supreme Court adopted the following rule of law for determining when the cause of action for breach of trust accrues: " 'If the trustee violates one or more of his obligations to the beneficiary * * *, there obviously is a cause of action in favor of the beneficiary and *any relevant Statute of Limitations will apply from the date when the beneficiary knew of the breach or repudiation*, or by the exercise of reasonable skill and diligence could have learned of it.' " (Emphasis sic.) *Id.* at ¶ 28, quoting George Gleason Bogert, *The Law of Trusts and Trustees*, Section 951 at 630-34 (2d Ed.Rev.1995). The court noted under the prevailing rule of law, "[k]nowledge of the beneficiary is the critical factor because when the beneficiary knows of the misconduct, he has knowledge that the trustee has repudiated his trust obligation. Upon learning of the repudiation, the time for the beneficiary to act begins to run." *Cundall* at ¶ 27. The *Cundall* court noted that " '[*c*]onstructive knowledge of the facts, rather than *actual* knowledge of their legal significance, is enough to start the statute of limitations running.' " (Emphasis sic.) *Id.* at ¶ 30, quoting *Flowers v. Walker*, 63 Ohio St.3d 546, 549 (1992).

{¶ 29} Consistent with the rule of law in *Cundall*, R.C. 5810.05(C), effective January 1, 2007, sets forth the limitation period for actions against a trustee, in relevant part, as follows:

> [N]otwithstanding section 2305.09 of the Revised Code, *a judicial proceeding by a beneficiary against a trustee for breach of trust must be commenced within four years after the first of the following to occur*:
>
> * * *
>
> (3) The termination of the trust;
>
> (4) *The time at which the beneficiary knew or should have known of the breach of trust.*

(Emphasis added.)[2]

{¶ 30} Pursuant to *Cundall* and R.C. 5810.05, contrary to RSA's assertion, the claims against HNB accrued and the four-year statute of limitations began to run when RSA either knew or should have known of the breach of trust, not when HNB "ended its role as trustee by selling the trust *res* and distributing the proceeds to the trust beneficiaries."[3]   (Emphasis sic.)   (Appellant's Brief at 2.)   To that end, we note R.C. 5801.03(A) provides a general definition of "knowledge" for purposes of trust matters. *Zook v. JPMorgan Chase Bank Natl. Assn.*, 10th Dist. No. 15AP-750, 2017-Ohio-838, ¶ 38.  That provision reads as follows:

> Subject to division (B) of this section, a person has knowledge of a fact if any of the following apply:
>
> (1)  The person has actual knowledge of the fact.
>
> (2)  The person has received notice or notification of the fact.
>
> (3) *From all the facts and circumstances known to the person at the time in question, the person has reason to know the fact.*

(Emphasis added.)  R.C. 5801.03(A).

{¶ 31} HNB argues the only reasonable inference to be drawn from the evidence presented both in support of and in opposition to the motion for summary judgment is that RSA either knew or should have known of the alleged breach of trust as early as 2007. HNB relies primarily on Lucas's deposition testimony in support of its argument.

{¶ 32} Lucas testified he is an account executive at RSA, and RSA's core specialty is the purchase and sale of municipal bonds.  Lucas stated RSA also gets involved in underwriting bond issues, but he acknowledged RSA had little experience in municipal revenue bonds for low-income housing.  Lucas maintained 85 to 90 percent of his business involves distressed municipal bonds.  According to Lucas, he considers

---

[2]"[W]here breach of trust claims are not barred by the applicable statute of limitations prior to the time when [R.C. 5810.05] went into effect, then, in that event, the statute of limitations set forth in [R.C. 5810.05] applies to the claim, notwithstanding other provisions." *Newcomer* at ¶ 29.

[3] This court issued its decision in *Cassner v. Bank One Trust Co., N.A.*, 10th Dist. No. 03AP-1114, 2004-Ohio-3484, several years prior to the effective date of R.C. 5810.05 and the decision of the Supreme Court in *Cundall*.  Thus, RSA's reliance on *Cassner* is misplaced.

municipal bonds "distressed" when the obligor fails to make debt service payments or a credit or other event occurs that casts doubt on the obligor's ability to pay. (Lucas Dep. at 103.) Lucas testified he typically does not get involved in the purchase of distressed municipal revenue bonds until the bonds are selling for 30 cents on the dollar or less.

{¶ 33} When Lucas purchased the Squirrel Run bonds in 2006, he did not consult the portion of the "official statement" pertaining to bondholder risks because "I know what the bondholder risks are." (Lucas Dep. at 190-91.) He did not obtain copies of the prior notices to bondholders of events of default issued by Trustee Moore when he made the initial purchase of bonds in 2006, even though he was aware he could obtain them from Trustee Moore. Lucas acknowledged he knew Trinity was in default when he made the initial purchase of bonds in 2006, but he could not recall whether he was aware Trinity had been in default since 2001. Lucas testified he believed there were still funds left in the debt service reserve fund at that time, and he was aware the Squirrel Run property was collateral for the underlying indebtedness. Lucas stated the exhaustion of the debt service reserve fund is a concern for bond holders but "[n]ot a major concern." (Lucas Dep. at 201.) He did acknowledge that a Notice to Bondholders in May 2006 stated there were no funds left in the debt service reserve fund.

{¶ 34} According to Lucas, the lack of cash flow was not a big concern to him when he purchased the Squirrel Run bonds because the collateral was still available for sale. Lucas testified he "didn't have any reason to believe the [fair market value of the Squirrel Run property] was extremely low." (Lucas Dep. at 203.) Lucas testified he first visited the property sometime in 2006 0r 2007, after the initial purchase of bonds. According to Lucas, he got a look at the buildings and grounds, and Trinity representative John Bojo permitted Lucas to inspect an unoccupied unit. Lucas testified the property consisted of well-maintained townhouses with "market grade type finishes." (Lucas Dep. at 159.) Lucas recalled Squirrel Run was "a good-looking facility; it wasn't run down." (Lucas Dep. at 162.) Lucas testified that Bojo spoke with him about Trinity's efforts to increase occupancy and "different methods to try to * * * get it leased up" and that there was "some competition." (Lucas Dep. at 161.) Lucas noticed a fire had damaged some of the units that were now empty, but he saw no "broken windows and junk cars." (Lucas Dep. at 161.) Lucas concluded Squirrel Run was a good property.

{¶ 35} According to Lucas, he drove through the facility on one occasion thereafter, either in 2007 or 2008, and he observed the property "[l]ooked all right," and he acknowledged the property was "still well-maintained." (Lucas Dep. at 159, 164.) After the visit, Lucas telephoned Bart Welprin, the commercial real estate broker who first alerted him to the availability of Squirrel Run bonds, and he told Welprin that the property "[l]ooks fine." (Lucas Dep. at 164.) In his deposition, Lucas maintained neither he nor Welprin expressed an opinion during the conversation regarding the fair market value of the Squirrel Run property.

{¶ 36} HNB cites Lucas's deposition testimony as support for its contention RSA knew or should have known as early as 2007 or 2008 of the operative facts that allegedly support its claim for breach of trust. In his deposition, Lucas testified as follows:

Q. Did you think it should get foreclosed on at that time?

A. I think that I—I would have liked to have seen it happen sooner than later. The bonds weren't being paid on, so we weren't getting any interest, and I—I thought that it was past time that the discussion take place.

Q. Past time that the discussion about a foreclosure take place?

A. Uh-huh.

Q. And this is in 2007?

A. Yeah.

Q. And it was your feeling that the property should be sold so that bondholders could cash out, correct?

A. Yeah. Right, yes.

Q. Did you tell Ms. Moore that?

A. I told Ms. Moore that—and I don't know if it was that particular conversation, but I told Ms. Moore on several occasions that we should form a bondholder committee and discuss the—and see what the other bondholders had to say about moving forward with—with some sort of resolution.

Q.  And this is all before Huntington foreclosed?

A.  Correct.

Q.  And what would the purpose of the bondholder committee be?

A.  It's a fact-finding mission and weigh the options and—and get the—get the trustee to—to act.

Q.  And what did Ms. Moore say in response to that?

A.  Nothing.

Q.  And you say you wanted to get the trustee to act, correct?

A.  Uh-huh.

Q.  What did you want the trustee to do?

A.  You know, enforce their remedies, whatever they are.  So if they could—if they could—if the obligor had some money or they were holding money back, maybe they could come up with some money and—and make up some past due payments, start marketing the property.

Q.  But none of that happened?

A.  No.

(Lucas Dep. at 174-76.)

{¶ 37} Concerning Trustee Moore's representation about the efforts to obtain additional financing in 2008 and the conduct of the trustee, Lucas testified as follows:

Q.  Were you aware of refinancing efforts that were going on in 2008?

A.  According to the—to the event notice, the—I didn't believe there was any refinance opportunities in '08.

Q.  Did you see any way to get value out of these bonds other than through a sale of the Squirrel Run Apartments?

A.  I could—I could put—I could put them up for sale.

Q. Okay. Other than selling the bonds, was there any way that you'd get money—

A. Extract value?

Q. Yeah. Extract value from the bonds in 2008?

A. No. At that point—you know, at that point it's—you know. Sell—sell the facility.

Q. In your view was it time to pull the plug and sell the facility?

A. I thought it was past time.

Q. Did you tell that to Ms. Moore?

A. If you tell a trustee's administrator that you don't think they're doing their job properly, they're not going to take your calls. So no. I didn't.

Q. But that's what you thought?

A. What?

Q. That the trustee's administrator wasn't doing their job properly?

A. There wasn't—there didn't seem to be much happening at that point.

Q. At this point the bonds were seven years in default, correct?

A. When was the first default, '01?

Q. November of 2001.

A. 2001, so, yeah, approximately.

Q. Had you ever seen a default situation go this long?

A. No.

Q. And in your view it was time for Huntington to move forward with foreclosing on the property or take some attempts at selling the property, correct?

A. Yeah, but I wasn't worried.  I mean I wasn't worried about it.  I'd never gotten an indication that—that there was a—that there was a big problem, that there was—you know, that the facility wasn't worth anything.

Q. But in 2008, I mean, there was no other way that the trustee was going to extract any value out of this project other than through selling the property at that point?

A. That's correct.

Q. And that wasn't happening?

A. No.  It wasn't happening.

(Lucas Dep. at 238-40.)

{¶ 38} R.C. 5808.04 imposes a duty on a trustee to "administer the trust as a prudent person would and shall consider the purposes, terms, distributional requirements, and other circumstances of the trust.  In satisfying this standard, the trustee shall exercise reasonable care, skill, and caution."  Pursuant to R.C. 5808.09, "[a] trustee shall take reasonable steps to take control of and protect the trust property."  R.C. 5810.01 sets out the remedies available to beneficiaries for a breach of trust.  R.C. 5810.01(B) authorizes the court to issue orders designed to "remedy a breach of trust that has occurred or may occur," including compelling the trustee to perform the trustee's duties, enjoining the trustee from committing a breach of trust, removing the trustee, and ordering any other appropriate relief.[4]

{¶ 39} Lucas's deposition testimony establishes at some point in 2008, RSA became aware of the operative facts that allegedly support its breach of duty claims

---

[4] R.C. 5810.02(A) sets forth the damages for a breach of trust, in relevant part, as follows:

A trustee who commits a breach of trust is liable to the beneficiaries affected for the greater of the following:

(1) The amount required to restore the value of the trust property and trust distributions to what they would have been had the breach not occurred.

against HNB.   Based on Lucas's deposition testimony, there is no question that by sometime in 2008, RSA knew Trinity was not meeting its obligations regarding debt service and alternative financing options had been unsuccessful.   Sometime in 2008, Lucas had formed the opinion the only way the trustee could preserve the assets of the trust was to file a foreclosure action against Trinity and sell the collateral.   Lucas knew Trustee Moore had no intention of doing so at that time.   Lucas also acknowledged Trustee Moore had failed to respond to his informal request to form a bondholder committee and had not become engaged in marketing the property.   Thus, the only reasonable conclusion to be drawn from the evidence submitted in connection with the motion for summary judgment is that RSA's cause of action for breach of trust and/or breach of fiduciary duty accrued sometime in 2008 when Trustee Moore failed to timely initiate foreclosure.   Because RSA did not file its complaint in Montgomery County until July 31, 2013, the four-year statute of limitations bars RSA's claims against HNB.

{¶ 40} In opposition to the motion for summary judgment, RSA claims the notices to bondholders issued by Trustee Moore combined with Trustee Moore's direct communications with Lucas misled RSA about Trinity's financial condition and the market value of the Squirrel Run property, causing RSA to reasonably believe the bonds remained a sound investment.   The duty to keep the beneficiaries/bondholders reasonably informed of the administration of the trust is a fundamental duty of a trustee. *Kidd v. Alfano*, 2d Dist. No. 26598, 2016-Ohio-7519, ¶ 29, citing R.C. 5807.06.   R.C. 5808.13 describes in general terms a trustee's duty to inform and report, in relevant part, as follows:

> (A)  A trustee shall keep the current [bondholders] of the trust reasonably informed about the administration of the trust and of the material facts necessary for them to protect their interests. Unless unreasonable under the circumstances, a trustee shall promptly respond to a [bondholder's] request for information related to the administration of the trust.

{¶ 41} The record shows as early as February 26, 2004, Trustee Moore notified bondholders that "ongoing routine repair and maintenance items, such as fixing storm drains and downspouts and replacing carpet, have regularly fallen behind as occupancy and revenues have not kept pace.  There are frequent roof repair needs, patio dividers and

balcony floors and railings have deteriorated wood and fogged up patio doors have been an ongoing problem." (Joint Ex. 10 at 2.) Additionally, on November 5, 2004, Trustee Moore notified bondholders that Reilly had "not been able to obtain FHA mortgage insurance due to receipt of an appraisal that was lower than needed for a full refinancing." (Joint Ex. 13 at 2.) Lucas also visited the site on two occasions, once in 2007 and one other time in 2007 or 2008. Thus, Lucas had an opportunity to personally observe the condition of the property securing the bonds in 2007 and 2008. There can be no doubt, based on this undisputed evidence, RSA either knew or should have known in 2007 or 2008 of Trustee Moore's alleged breach of duty in failing to preserve the real property securing the bonds.

{¶ 42} Though Lucas maintained he had several conversations with Trustee Moore between the years 2007 and 2009 regarding the Squirrel Run property, he acknowledged Trustee Moore discussed the value of the RSA property with him on only one occasion. Lucas's testimony regarding the conversation is as follows:

> Q. From Febuary 20—from Febuary 2006 through April 2009, did you have any communications with anyone regarding what the fair market value of the Squirrel Run Apartments was?
>
> A. Yeah I did. I do recall that I had a telephone conversation with [Trustee] Moore at one point discussing, you know, what—what's the outcome going to be here, you know, what's going to happen here. And she—she assured me that, you know, that there was a—there was a good appraisal out there and that they had some—she had some interested buyers. And she didn't enumerate market value, but I got from that conversation it wasn't a complete disaster.
>
> Q. When was this conversation?
>
> A. Oh, gosh, I'm really bad at dates as I told you. I'm going to say it was a couple years prior to foreclosure.

(Lucas Dep. at 168.)

{¶ 43} The undisputed evidence in the record shows on or about the time Lucas's conversation with Trustee Moore took place, Lucas had visited the property and had gotten a look at the buildings and grounds, including a tour of one of the apartment units.

At the time he spoke with Trustee Moore, Lucas also had access to all prior notices sent by Trustee Moore to the bondholders. Additionally, though Lucas recalled Trustee Moore told him she had interested buyers for the property, she did not tell him she had received any offers. Lucas acknowledged Trustee Moore never offered her opinion regarding the market value of the Squirrel Run property.

{¶ 44} With regard to the alleged misrepresentations and misinformation regarding Trinity's financial condition vis-à-vis RSA's investment in the Squirrel Run property, it is difficult to conceive on this record how RSA could have been unaware of Trinity's desperate financial condition in light of the information contained in the numerous notices issued by Trustee Moore, as summarized above. RSA argues Trustee Moore mislead bondholders in the event notice of November 5, 2004, when she indicated "[o]ther refinancing alternatives are being explored." (Joint Ex. 13 at 2.) Even if we accept RSA's contention Trustee Moore mislead bondholders into believing alternative financing was available, Lucas acknowledged by 2008 he did not believe alternative financing options existed. Thus, there is no question Lucas harbored no misconceptions about the refinancing options in 2008. In discussing RSA's claims regarding Trustee Moore's comments to Lucas, the trial court stated: "On this record, informal and isolated comments by [Trustee] Moore did not constitute misleading misconduct that legally delay[ed] [RSA's] obligation to investigate legal action against HNB." (Mar. 30, 2017 Decision at 7.) Based on our review of the record, we agree with the trial court that no reasonable trier of fact could interpret Trustee Moore's alleged statements to Lucas in the manner suggested by RSA.

{¶ 45} Taking the above-cited evidence and RSA's arguments into consideration, the trial court found RSA's claims for breach of fiduciary duty and breach of trust accrued, at the latest, in April 2009 when Trustee Moore filed the foreclosure action in Montgomery County and notified bondholders of that fact. The trial court found it significant that in addition to all the information contained in the prior notices provided to bondholders, the April 2, 2009 complaint sought the appointment of a receiver. The trial court stated the "request was a red flag warning to bondholders" that their investment was in jeopardy. (Mar. 30, 2017 Decision at 9.) We agree.

{¶ 46} As noted above, our de novo review of the evidence submitted in connection with the motion for summary judgment convinces us RSA either knew or should have known of the breach of trust sometime in 2008 when Lucas formed the opinion that the only means to preserve the value of the property for later distribution to the bondholders was to bring a foreclosure action against Trinity and sell the Squirrel Run property. Lucas believed it was "past time" to "pull the plug and sell the facility." (Lucas Dep. at 239.) Though Lucas's conduct in continuing to purchase bonds even after Trustee Moore filed the foreclosure action permits the inference that RSA did not recognize or appreciate the degree of risk associated with the investment, the evidence in the record does not permit an inference RSA was without actual or constructive knowledge on or before April 2009 of the operative facts which gave rise to the claims for breach of trust alleged in their complaint. Even construing the evidence in RSA's favor, any optimism regarding either the financial position of Trinity or the value of the Squirrel Run property that was created by Trustee Moore's statements to Lucas should have been dispelled by the filing of the foreclosure action and the request for appointment of a receiver in April 2009. It is impermissible on this record to infer RSA did not have actual or constructive knowledge of the alleged breach of trust in April 2009.

{¶ 47} RSA next contends the delayed damages rule applies to its claims for breach of fiduciary duty and breach of trust. We disagree.

{¶ 48} Under the delayed damages rule, " 'where the wrongful conduct complained of is not presently harmful, the cause of action does not accrue until actual damage occurs.' " *Flagstar Bank, F.S.B. v. Airline Union's Mtge. Co.*, 128 Ohio St.3d 529, 2011-Ohio-1961, ¶ 19, quoting *Velotta v. Leo Petronzio Landscaping, Inc.*, 69 Ohio St.2d 376, 379 (1982). "Unlike the discovery rule, the delayed-damages rule does not just toll the running of the statute of limitations, it adjusts when the cause of action accrues." *Chateau Estate Homes, L.L.C. v Fifth Third Bank*, 1st Dist. No. C-160703, 2017-Ohio-6985, ¶ 14. "In other words, a cause of action for negligence is not complete, and the statute of limitations does not begin to run, until there has been an injury." *Flagstar* at ¶ 19.

{¶ 49} In *Union Sav. Bank v. Lawyers Title Ins. Corp.*, 191 Ohio App.3d 540, 2010-Ohio-6396 (10th Dist.), this court held a bank's claim against a title company

alleging negligence and breach of fiduciary duty was time-barred because the cause of action accrued when the homeowners closed on their loan and the title company failed to subordinate two mortgages, not when the property went into foreclosure and was sold at a sheriff's sale. *Id.* at ¶ 33. In rejecting the homeowners' delayed damages argument, this court ruled that the plaintiff-bank suffered damages at the time of the closing when it assumed a second lien position due to the defendant's failure to subordinate two liens. *Id.*[5]

{¶ 50} Here, RSA alleges that HNB breached a duty to bondholders when Trustee Moore failed to timely file a foreclosure action against Trinity. RSA claims it suffered harm as a result of Trustee Moore's breach due to the subsequent decrease in the market value of the real property securing the bonds.[6] Though RSA did not discover the full extent of its losses until 2012 when the real property securing the investment sold in foreclosure, RSA suffered a loss and the breach of trust occurred when Trustee Moore failed to act. Under R.C. 2305.09 and 5810.05, RSA's cause of action against HNB accrued when RSA either knew or should have known facts which would have alerted it to Trustee Moore's breach, not when the property securing the investment sold in foreclosure. Thus, to the extent the delayed damages rule remains viable in Ohio, we find the rule is inapplicable in this case.

{¶ 51} For the foregoing reasons, we hold the trial court did not err when it granted HNB's motion for summary judgment. RSA's claims for breach of fiduciary duty and breach of trust accrued when, from all the facts and circumstances known to RSA, RSA either knew or should have known of the breach of trust, not when the trust terminated. Construing the evidence in RSA's favor, we find RSA knew of or should have known of the alleged breach of trust on or before April 2009. The statute of limitations barred RSA's claims against HNB as a matter of law because HNB did not file the complaint in

---

[5] There is considerable doubt as to the continued viability of the delayed damages rule in Ohio. See, *e.g.*, *LGR Realty, Inc. v. Frank & London Ins. Agency*, ___ Ohio St.3d ___, 2018-Ohio-334, ¶ 32-34 (Dewine, concurring); *Flagstar* at ¶ 25-27, citing *Investors REIT One v. Jacobs*, 46 Ohio St.3d 176 (1989); *Chateau Estate* at ¶ 22.

[6] In his deposition, RSA's expert, Robert Irwin Landau, testified "as the months and years went by, the value of the property went down [and] if the trustee had acted more aggressively, * * * quicker, if they had pulled the trigger quicker and disposed of the property sooner, the probability of the bondholders receiving more than they got at finally six or seven years later is significantly higher." (Landau Dep. at 260.)

Montgomery County within four years of the date when it knew or should have known of the breach of trust.

## V.  CONCLUSION

{¶ 52} Having overruled appellant's sole assignment of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

TYACK and KLATT, JJ., concur.

————————————